**Vincent JAMES a/k/a Victor James, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 64S00–9012–DP–01050.**

Supreme Court of Indiana.

April 29, 1993.

As Amended May 13, 1993.

⬅680(1)

Donald W. Pagos, William Janes, Swee-
ney, Dabagia, Donoghue, Thorne, Janes &
Pagos, Michigan City, for appellant.

Pamela Carter, Atty. Gen., Arthur Thad-
deus Perry, Deputy Atty. Gen., Indianapo-
lis, for appellee.

KRAHULIK, Justice.

Defendant–Appellant, Vincent James,
was convicted by jury of one count of felo-
ny murder in connection with the death of
Gayle Taylor during a robbery. *Ind. Code*

*Ann.* §§ 35–42–1–1(2) (West Supp.1992) (felony murder) and 35–42–5–1 (West 1986) (robbery). Because the death penalty was sought, the jury was reconvened and, after hearing evidence and argument of counsel, recommended that the death penalty be imposed. *Ind.Code Ann.* § 35–50–2–9(b)(1)(G) (West Supp.1992). In addition, the jury found James to be an habitual offender. *Ind.Code Ann.* § 35–50–2–8 (West Supp.1992). The trial court entered a sentencing order which found that James should be executed. We address the following issues raised in this direct appeal:

(1) Whether the trial court erred in allowing testimony from a "blood spatter" expert hired by the State without allowing James the funds to hire his own expert;

(2) Whether the trial court erred in refusing to grant a mistrial after the State twice introduced evidence of James' criminal history;

(3) Whether the trial court erred in refusing to grant a mistrial after the State withdrew certain evidence;

(4) Whether the trial court erred in granting a jury request to replay a videotape;

(5) Whether the trial court erred in denying James' motion for a directed verdict at the conclusion of the habitual offender phase;

(6) Whether James' pre-trial confession was properly admitted;

(7) Whether a witness's identification of James was properly admitted;

(8) Whether admission of a "mug shot" photographic array constituted reversible error;

(9) Whether the trial court erred in failing to grant a new trial based upon newly-discovered evidence; and

(10) Whether the change of venue was proper.

Having reviewed the transcript in light of the alleged errors, we reverse the sentence of death on issue (1) and remand the case for a new death penalty trial. We affirm the conviction for felony murder. Other issues were raised by James in his brief, but in view of our decision today, they need not be discussed.

### Facts

On December 15, 1989, James entered an office of an insurance agency in Michigan City, Indiana, because he had heard that insurance companies keep large amounts of money on hand. During the course of the ensuing robbery, Gayle Taylor, who worked in the insurance agency office, was shot once in the head with James' gun. At approximately 1:55 p.m., the police were alerted to the shooting by a telephone call from the victim. When police arrived, they found her on the floor in a small room in the rear of the insurance office, with blood spattered around the room. The outer office appeared intact. Witnesses identified James as being in the vicinity of the agency near the time of the shooting. One of those witnesses worked in the office next door and reported hearing a single gunshot.

After James was arrested, he was taken to the Michigan City police headquarters to be booked. When asked to empty his pockets, he put his hand up to his mouth and coughed. When officers took hold of him, a ring fell from his mouth. That ring was identified by the victim's fiancé as the engagement ring he had given her. Ultimately, James admitted entering the insurance agency to steal money. He admitted that he had instructed the victim to give him the ring, which she did. He also stated that when he instructed the victim to move into the smaller back room where the victim was found, they began arguing and the gun went off accidentally. The victim died as a result of the gunshot wound. There were no other apparent injuries.

### Blood Spatter Expert

Dean Marks, a sergeant with the Indiana State Police, testified during the guilt phase of the trial as an expert witness concerning the interpretation of the pattern of blood spatters found at the scene of the shooting. The trial court denied James' timely requests for funds to hire his own blood spatter expert and overruled James'

timely objections to Marks' testimony. James claims that admission of Marks' testimony constituted reversible error because (1) the trial court should have approved funds for James to hire his own blood spatter expert or, alternatively, (2) blood spatter interpretation was not a proper subject for expert testimony. We agree that he was entitled to his own expert.

During the guilt phase of the trial, James defended a charge of felony murder; thus, the State was not required to prove that James had any intent to kill the victim, but only that he intended to rob and that the victim was killed during the robbery. *Ind. Code* § 35–42–1–1(2) and *Ind. Code* § 35–42–5–1. After he was found guilty of felony murder, the jury was reconvened to consider a recommendation of death. As the lone statutory aggravator used to support the death penalty count, the State was required to prove that James had the intent to kill. *Ind. Code* § 35–50–2–9(b)(1)(G). Sergeant Marks' testimony, that the victim's head was approximately one foot from the floor at the time she was shot, tended to support the State's theory that the killing occurred as an intentional act on James' part to execute the only witness to his crime. The testimony tended to negate James' assertion in his pre-trial statement to police that the victim was shot accidentally in the midst of a struggle. Thus, the opinion of the blood spatter expert was testimony central to the State's death penalty case.

■ In Indiana, a criminal defendant is not constitutionally entitled, at public expense, to any type or number of expert witnesses he desires to support his case. *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 640, *cert. denied* —— U.S. ——, 112 S.Ct. 1299, 117 L.Ed.2d 521. A defendant who requests funds for an expert witness has the burden of demonstrating the need for that expert. *Id.* The appointment of experts is left to the sound discretion of the trial court, and only an abuse of that discretion will result in a reversal, but a trial court must provide a defendant access to experts where it is clear that prejudice will otherwise result. *Id.* Issues which the trial

court should consider in determining whether a defendant is entitled to funds for an expert include (1) whether defense counsel already possesses the skills to cross-examine the expert adequately or could prepare to do so by studying published writings, *Id.;* (2) whether the purpose of the expert is exploratory only, *Hough v. State* (1990), Ind., 560 N.E.2d 511, 516; and (3) whether the nature of the expert testimony involves precise physical measurements and chemical testing, the results of which were not subject to dispute. *Schultz v. State* (1986), Ind., 497 N.E.2d 531, 533–34. In cases where a defendant faces the death penalty, we also have held that the failure to allow the defendant appropriate resources to retain an expert who would give an opinion concerning the statutory mitigator, may require reversal of the death penalty. *Castor v. State* (1992), Ind., 587 N.E.2d 1281, 1288.

■ We find *Castor* more applicable to this case than those cases relied upon by the State, viz, *Hough*, *Schultz* and *Jackson*. The testimony from the blood spatter expert, which provided evidence of an intentional killing, was central in the penalty phase and was highlighted by the State in final argument. Knowledge concerning cross-examination of blood spatter experts is not the kind of experience that defense counsel would normally be expected to possess. In fact, defense counsel was left to use, as a resource for cross-examination, a book that Sergeant Marks adopted as authoritative on the subject of blood spatter interpretation, but the contents of which Sergeant Marks was unable to explain. In addition, Sergeant Marks acknowledged that other experts interpreting the same evidence in this case might reach different conclusions. Under these facts, and where the defendant faces the ultimate penalty, we conclude that it was error not to provide the defendant with a blood spatter expert. Therefore, we must reverse the death penalty.

■ However, we disagree with James' contention that interpretation of blood spatters was not a proper subject of

expert testimony or that Sergeant Marks was not qualified to give that testimony. Expert testimony is appropriate where (1) the subject matter of the opinion is distinctly related to some science, profession, business or occupation beyond the knowledge of the average lay person; and (2) the witness has sufficient skill, knowledge or experience in the field such that the witness' opinion or inference will aid the trier of fact in the search for truth. *Fox v. State* (1987), Ind., 506 N.E.2d 1090, 1095. No precise amount of knowledge is required; the extent of the witness' knowledge affects the weight of his testimony, not its admissibility. *Rowan v. State* (1982), Ind., 431 N.E.2d 805, 816.

 Indiana courts have previously allowed expert testimony on blood spatter interpretation. *See King v. State* (1988), Ind., 531 N.E.2d 1154, 1157; *Fox v. State,* 506 N.E.2d at 1095; *Hampton v. State* (1992), Ind.App., 588 N.E.2d 555, 557–58. We find the discussion in *Hampton* persuasive on this issue, and hold that the trial court did not abuse its discretion in permitting the State to present expert testimony from a blood spatter interpretation expert. Sergeant Marks' qualifications—he had attended two schools in blood stain interpretation, performed approximately twenty-five blood stain interpretations in the past, and previously testified as an expert—are superior to the qualifications approved by this Court in *Fox,* 506 N.E.2d at 1095. The trial court acted within its discretion in finding Marks' qualifications acceptable and in recognizing blood spatter interpretation as an appropriate area of expertise.

### Evidence of Criminal History is Not Reversible Error

 James asserts that the trial court erred in refusing to grant a mistrial after the State twice introduced evidence of his criminal history. We do not agree.

The first incident occurred during the testimony of a detective who volunteered that James, when the victim's engagement ring was found in his possession, said he had obtained it "the day after he got out of jail." The second incident occurred during the testimony of another police officer as a videotape of James' booking procedure was shown to the jury. The videotape contained a statement by James that he was "on probation." Despite the trial court's order, the videotape was not forwarded past the comment, and the jury heard James' reference to being on probation. In both of the above instances, the trial court promptly admonished the jury to disregard the references to James' criminal history, but denied motions for mistrial. James argues that this was insufficient because no admonishment, however strong, could have eliminated the prejudice.

 James correctly states the general rule that evidence of a defendant's prior criminal history is highly prejudicial and should not be admitted. *Roche v. State* (1992), Ind., 596 N.E.2d 896, 901. Nonetheless, a mistrial is an extreme remedy warranted when no other curative measure will rectify the situation and is a matter committed to the sound discretion of the trial court. *Szpyrka v. State* (1990), Ind., 550 N.E.2d 316, 318. When determining whether a mistrial is warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Jackson v. State* (1988), Ind., 518 N.E.2d 787, 789. A trial judge is in the best position to gauge the surrounding circumstances and potential impact on the jury when deciding whether a mistrial is appropriate. *Szpyrka,* 550 N.E.2d at 318. A timely and accurate admonition is presumed to cure any error in the admission of evidence. *Green v. State* (1992), Ind., 587 N.E.2d 1314, 1317. On appeal, where the jury's verdict is supported by independent evidence of guilt such that we are satisfied that there was no substantial likelihood that the evidence in question played a part in the defendant's conviction, any error in admission of prior criminal history may be harmless. *Jaske v. State* (1989), Ind., 539 N.E.2d 14, 22.

Here, the evidence of guilt was overwhelming: an eyewitness identified James

as the man who entered the insurance office shortly before the crime, James was found in possession of the victim's engagement ring, and James admitted to the robbery and the killing. Based on our review of the record, we hold that the trial court's prompt admonishment was sufficient to cure any prejudice with regard to the finding of guilt on the felony murder charge.

### Mistrial Was Not Required After Withdrawal of Evidence

■ In its case-in-chief, the State introduced into evidence a razor blade and hair found around the sink in the apartment where James was arrested. James objected to the evidence on the grounds that there was no proof connecting the hair and the razor with him. The evidence was admitted, subject to the State's representation that it would be "connected up" by evidence that James' appearance had changed after the commission of the crime by his shaving and shortening his hair. The State later informed the trial court that it would be unable to "connect up" the exhibits and offered to withdraw them from evidence. The exhibits were never examined by the jury. James objected and moved for a mistrial. The court denied the motion for mistrial, but admonished the jury. James contends that the admonishment was not sufficient to cure the prejudice to him. We conclude it was.

■ The trial court is in the best position to determine whether a mistrial is appropriate, and great deference is given to the trial judge on appeal as he is in the best position to judge the circumstances and impact on the jury. *Jackson v. State* (1991), Ind., 575 N.E.2d 617, 622. We do not perceive that the contingent admission of these exhibits would have influenced the jury in a way that could not be corrected by the admonishment. As discussed in the preceding section, the evidence of James' guilt was overwhelming. Under these circumstances, we find no error in denying the motion for mistrial.

### Replay of Videotape Not Reversible Error

James next contends that reversible error occurred when the trial court allowed the jury, outside of his presence, to view a replay of a videotape. James attacks both the authority of the trial court to permit review of evidence before deliberations begins, and the method employed by the trial court in allowing the jury to review evidence outside James' presence.

At the close of its case-in-chief, the State's motion to publish various exhibits was granted. The trial court indicated its intent to allow the jury to examine these exhibits, which it had not previously seen, in a closed courtroom during the lunch hour. No objection was made to this procedure. The trial court advised the jury that the review of the exhibits was for the purpose of examination only, not for deliberation or discussion. At some point during this review, one or more of the jurors requested that a videotape of a lineup in which James participated be replayed for them. The videotape had been entered into evidence and viewed by the jury during the State's case-in-chief, but apparently some of the jurors had not been able to adequately see the videotape because of the size of the screen. When defense counsel became aware that the trial court intended to replay the videotape, he objected on the grounds that replaying the tape before deliberations began would be improper because there was no Indiana authority for doing so, and that replaying the tape would be cumulative and repetitious. The trial court overruled these objections, ordered the courtroom cleared, and allowed the jury to review the videotape with only the bailiff present.

■ The trial judge must conduct the proceedings in a manner that facilitates ascertainment of the truth, insures fairness, and obtains economy of time and effort commensurate with the rights of both society and the criminal defendant. *Proctor v. State* (1992), Ind., 584 N.E.2d 1089, 1081. The trial court has wide discretion in ordering the manner in which evidence is presented to the jury during trial. *Inman v. State* (1978), 270 Ind. 130, 133,

383 N.E.2d 820, 823, *cert. denied,* 444 U.S. 855, 100 S.Ct. 114, 62 L.Ed.2d 74. Although this Court has been liberal in allowing the jury to rehear portions of the evidence, there are limitations on the trial court's discretion. For example, trial courts may not allow the jury to review the testimony of an entire trial. *Shaffer v. State* (1983), Ind., 449 N.E.2d 1074, 1075.

■■■ As James recognizes, *Ind. Code* § 34-1-21-6 allows the jury, under certain circumstances, to review evidence after they have begun deliberations; but he argues that because this statute applies only after deliberations have begun and no statute allows review of evidence before deliberations begin, the trial court had no authority to permit the jury to see the videotape. We do not agree. The statute permitting review of evidence during deliberations reflects the fact that there may be times when a review of evidence is necessary to a fair trial. James points to no reason why allowing the jury to review evidence before deliberations is, standing alone, any more or less prejudicial to his rights than reviewing evidence during deliberations. We find no cases suggesting that this is so, nor do we perceive any reasons of our own.

Clearly, jurors have the right to adequately view evidence presented to them. If, as here, the trial court determined that some jurors did not have that opportunity initially, then we hold that permitting a review of that evidence was within the judge's discretion. The trial court gave a proper instruction that the jury was not to begin deliberating. The tape was relatively brief and was corroborative of testimony from police officers concerning the lineup procedures. The fact that James participated in the lineup and was identified by an eyewitness in that lineup was not disputed at trial. Under circumstances such as these, we conclude that it was within the trial court's discretion to permit the jury to review the videotape.

■■■ James also contends that his right to be present at trial was violated when the trial court allowed the jury to review the videotape and other exhibits with only the bailiff present. Both the Sixth Amendment to the United States Constitution and Article 1 Section 13 of the Indiana Constitution guarantee the right of an accused to be present in the courtroom at every stage of the proceedings requiring the presence of the jury. *Dodson v. State* (1987), Ind., 502 N.E.2d 1333, 1337; *Miles v. State* (1944), 222 Ind. 312, 313, 53 N.E.2d 779, 781. Replaying testimony for the jury without notice to the defendant or his attorney violates the accused's constitutional right to be present. *Cape v. State* (1980), 272 Ind. 609, 612, 400 N.E.2d 161, 163.

We have recognized that a defendant may waive his right to be present, and have held that such a waiver should be an express one given by the defendant. *Miles,* 222 Ind. at 319, 53 N.E.2d at 782; *Harris v. State* (1967), 249 Ind. 681, 688, 231 N.E.2d 800, 804. *See also Dodson,* 502 N.E.2d at 1337 (waiver may be implied by defendant's conduct where the defendant is voluntarily absent from trial).

■■■ In *Harris,* we recognized that in the absence of waiver, a defendant's absence from any stage of the proceedings gives rise to a presumption that prejudicial error has occurred; the presumption is rebuttable, and the burden is on the State to show that the defendant was not prejudiced. 249 Ind. at 690, 231 N.E.2d at 805. *Accord Reynolds v. State* (1984), Ind., 460 N.E.2d 506, 508, *reh'g. den.* Ind., 463 N.E.2d 1087; *Bond v. State* (1980), 273 Ind. 233, 241, 403 N.E.2d 812, 819. In *Harris,* the defendant sought a new trial after the trial court addressed the jury while his attorney was present but defendant was absent. There was no objection at the time to the defendant's absence; in fact, an affidavit filed by the State recited that defense counsel, after having been asked specifically by the court if the defendant wished to be present, responded that he did not. On that record, this Court held that in the absence of an express waiver *from the defendant,* the trial court committed error in proceeding to address the jury. 249 Ind. at 688, 231 N.E.2d at 804. In *Reynolds,* the judge responded to a question from a juror during deliberations without inform-

ing defendant or his counsel until after the communication had taken place. This Court held that the trial court failed to adhere to the appropriate procedure and characterized the exchange between judge and jury as "highly improper." 460 N.E.2d at 508.

Here, the record reveals no express consent or waiver by James. Accordingly, the trial court committed error in failing to have James present at the time that the jury reviewed the videotape and other exhibits.

■ Just as in *Harris* and *Reynolds*, however, our inquiry does not end here. Not all trial court error is reversible error; the denial of a specific constitutional right does not automatically constitute reversible error. *Hart v. State* (1991), Ind., 578 N.E.2d 336, 337. Our focus is on whether the defendant was deprived of a fair trial as a result of his absence. *Harris*, 249 Ind. at 692, 231 N.E.2d at 806.

■ In *Reynolds*, no objection was made to defendant's absence until appeal. We noted the well-established rule that a party may not fail to object to a court's action and then raise the court's action as error on appeal unless the error is fundamental. 460 N.E.2d at 508. The fundamental error doctrine allows the reviewing court to bypass the normal rules of appellate procedure and, in so doing, to disregard the sound judicial policy underlying that procedure. *Williams v. State* (1978), 178 Ind.App. 554, 556, 383 N.E.2d 416, 417. In order to rise to the level of fundamental error, the error must constitute a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and apparent. *Reynolds*, 460 N.E.2d at 508.

In *Bond*, 273 Ind. at 237, 403 N.E.2d at 819, we held that the presumption of error resulting from the defendant's absence from the courtroom may be overcome where defense counsel failed to make a timely objection. ("It is apparent that no harm could come from the incident, hence [defense counsel] sought neither the declaration of a mistrial nor the substitution of an alternate for the exposed juror, and the error was, thereby, waived.")

Here, although defense counsel was aware of the trial court's intention to allow the jury to view evidence outside of James' presence, defense counsel made no objection on those grounds. Had a timely objection been made, the trial court could have immediately corrected the error. Given the evidence at trial, we do not perceive that the claimed error was so blatant that James was deprived of a fair hearing.

### Newly–Discovered Evidence

■ In his motion to correct errors, James claimed that he had newly-discovered evidence which would provide him with an alibi. The newly-discovered evidence was the testimony of Willy Orr, who indicated in an affidavit that he was with James at approximately 2 p.m. on the date of the offense. Because the police received the telephone call from the victim at 1:55 p.m., James argues that the testimony of Mr. Orr would provide him with an alibi and, thus, he is entitled to a new trial.

■ In order to obtain a new trial based on newly-discovered evidence, the defendant must show that (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or in confidence; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced on a retrial of the case; and (9) it will probably produce a different result. *Nunn v. State* (1992), Ind., 601 N.E.2d 334, 336–37. Even if the information presented in Mr. Orr's affidavit is believed, James' whereabouts shortly after the crime was certainly within James' knowledge before trial, and so we must conclude that due diligence was not used to discover it. Thus, James is not entitled to a new trial.

### Habitual Offender Evidence Sufficient

■ James urges that the trial court erred in refusing to grant his motion for judgment on the evidence at the close of the proceedings on the habitual offender

count. James premised his motion on the failure of the State (1) to prove the date of the principal murder during the habitual offender phase of the trial or (2) to move to incorporate the proof of the date of the principal offense presented during the guilt phase of the trial. Therefore, James argues, the evidence was insufficient to support the required finding that the principal offense was committed after sentencing on the prior felony. This Court rejected an identical argument in *Smith v. State* (1989), Ind., 543 N.E.2d 634:

> The State's burden in the habitual offender phase of a felony trial is to prove beyond a reasonable doubt that the defendant has accumulated two prior unrelated felonies. Of course, the defendant must have committed the first and been sentenced for it before he commits and is sentenced for the second and the second sentencing must have preceded the commission of the offense of which he was found guilty in the first part of the trial. Clearly the State must introduce evidence during the habitual proceeding to prove the two priors. On the other hand, the jury hearing the habitual evidence already knows when the defendant committed the crime of which it has just found him guilty. The statute does not require the State to reprove that fact a second time to the same jurors.

*Id.* at 636 (citations omitted). The evidence was sufficient for the jury to find James to be an habitual offender.

### Confession Was Admissible

James contends that his pre-trial confession should have been held inadmissible. James was arrested at approximately 9:00 p.m. on the date of the crime and was advised of his rights at that time. He also signed a waiver card agreeing to a lineup the same day. At approximately 11:00 p.m., the police began questioning him. At 4:15 a.m., while the LaPorte County prosecutor was explaining to James that he would be charged with murder if the victim died, James inquired whether he had a right to an attorney. The prosecutor responded, "Certainly," and pointed to a telephone in the room. James looked at the phone, then at the individuals in the room and indicated that he would give a statement after talking to a female friend. Some twenty minutes later, James admitted to shooting the victim. Pre-trial motions to suppress the statement were denied as were James' objections at trial.

James acknowledges that the admissibility of a confession is controlled by determining, from the totality of the circumstances, whether the statement was given voluntarily. Under the Sixth and Fourteenth Amendments to the United States Constitution, the defendant has the right to the presence and advice of counsel during custodial interrogation. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Once the right to counsel has been asserted by the defendant, the defendant may not be further interrogated until counsel has been made available, unless the defendant initiates further communication and thereby knowingly and intelligently waives the right previously invoked. *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. These principles necessarily are followed by Indiana courts. *See e.g., Bane v. State* (1992), Ind., 587 N.E.2d 97, 103.

James argues that even if his question to the prosecutor was not a clear request for counsel, the authorities should have continued to question him only about whether he actually wished to have counsel present. He argues that standing mute and pointing to a telephone was a wholly inadequate response under *Sleek v. State* (1986), Ind., 499 N.E.2d 751, 752. In *Sleek,* this Court held that the statement, "I feel like I ought to have an attorney around," was sufficient to invoke the defendant's right to have counsel present, and the fact that the defendant gave a statement following that request could not be used to cast doubt on the clarity of his initial request for counsel. *Id.* at 754.

We find the instant case is more like *Pasco v. State* (1990), Ind., 563 N.E.2d 587. In *Pasco*, the defendant, after being advised of his rights, stated, "I don't know

what to do ... I don't know if I should stop or if I should get a lawyer." This Court found those statements were not a definite request for the assistance of counsel and, therefore, the police were not required to stop their questioning. *Id.* at 591. Here, James had been advised of his right to an attorney and had signed a waiver of rights form indicating that he did not want an attorney at that time. When, during further questioning, he asked if he had the right to counsel, he was told that he did. We view his question as simply a reaffirmation of his own understanding; he reconfirmed that he had a right to an attorney if he wanted one. James made no request for counsel, even ambiguously. He was apprised of and understood, but did not invoke, his right to counsel. *Id.* at 592. His statement was properly admitted.

### Identification Evidence Was Properly Admitted

James argues that the trial court erred in admitting evidence of photographic, lineup, and in-court identification of him by a witness, Amy Worek. Worek, who worked in an office next door to where the crime occurred, identified James as the person she observed going into the insurance office shortly before the victim was shot. She identified James from a photographic array, in a lineup, and in court. Approximately two hours after the crime, Worek was shown facial color photographs of males of African descent by a member of the Michigan City police department. She selected James' photograph, which was the second one shown to her. At that time, the officer instructed her to look at all of the photographs before making her final decision. After she had viewed all of the photographs and again selected the photograph of James, the officer told her that in his own mind, he thought James was the one who had committed the crime. James objects to this process as being impermissibly suggestive.

 It is well-established that due process of law requires suppression of testimony concerning an out-of-court identification when the procedure employed was unnecessarily suggestive. *Stovall v. Denno* (1967), 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199; *Dillard v. State* (1971), 257 Ind. 282, 286, 274 N.E.2d 387, 389. Whether the procedure employed was "unnecessarily suggestive" in a particular case is to be determined under the totality of the circumstances. *Lyons v. State* (1987), Ind., 506 N.E.2d 813, 815. Factors to be considered in evaluating the likelihood of a misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, and (4) the level of certainty demonstrated by the witness. *Id.*

 James asserts that the photographic array was impermissibly suggestive because immediately after the incident, Worek informed police investigators that she probably could not recognize the face of the man that she had observed, and was not sure whether he was of African descent or belonged to some other non-Caucasian racial group. James claims that the police should have shown her photographs of men of other races, and that James' distinctive hairstyle emphasized his photograph in the array. We do not agree. The record reveals that several males of African descent with varying degrees of skin darkness, most with mustaches, one without, were shown to Worek. It does not appear to us that the defendant's photograph was so unique as to be emphasized in any unduly suggestive manner.

 Although it is true that Worek identified James as the photographs were laid down one by one, she was immediately instructed to look at all of the photographs before making her final decision. Further, it was not until after she had selected James' photograph from the array that the officer indicated that in his own mind he thought that James was the one. We do not find this procedure unduly suggestive. *See Head v. State* (1982), Ind., 443 N.E.2d 44, 54.

 James also claims that the procedures used in the subsequent lineup were

overly suggestive. Worek had described the suspect as having a mustache and bulging eyes. James was the only person in the lineup with facial hair and, thus, he argues, the only man matching the general description of the perpetrator. In addition, Worek testified that she expected the man whose photograph she had selected from the photo array to be included in the lineup. Even if we assume that the lineup was overly suggestive, if there is an independent basis for her in-court identification, then it is admissible. *Stacks v. State* (1978), 175 Ind.App. 525, 530, 372 N.E.2d 1201, 1206. The fact that a police officer informed Worek that she had chosen the person he thought had committed the crime did not necessarily taint the witness's in-court identification. *Chapman v. State* (1990), Ind., 556 N.E.2d 927, 932; *Wethington v. State* (1990), Ind., 560 N.E.2d 496, 502–503; *French v. State* (1987), Ind., 516 N.E.2d 40, 42. We conclude that Worek had a sufficient independent basis for her identification of James in court. She was able to observe him in daylight walking toward the office. She accurately described the clothing he was wearing and was quite certain of her identification during the photo array. Her pre-trial identifications were made the same evening as the crime occurred. We are assured, on this record, that the in-court identification was admissible.

### Photographic Array Was Properly Admitted

■ James contends that the trial court erred in admitting into evidence the photographic array shown to Worek because the photographs were "mug shots" which suggested to the jury that the individuals had a criminal record.

This Court has stated that the danger in admitting "mug shots" is that they show the "well-known frontal and profile view of a person with prison numbers and legend thereon referring to arrests or convictions [and] that there is an implication that the pictures were taken some time in the past when the defendant was charged or convicted of past crimes." *Teague v. State* (1978), 269 Ind. 103, 112, 379 N.E.2d 418,

422. Similarly, in *Strong v. State* (1982), Ind., 435 N.E.2d 969, an array of ten mug shot photographs from which the victim selected the defendant was passed to the jury. Small white cards had been stapled over the bottom of each photograph in an attempt to hide an identifying chain and plate. This Court held that the admission of the photographs was erroneous because the prejudicial portions of the photographs had been inadequately covered and any juror could have glanced under the card and thereby learned that the defendant had been arrested for a prior armed robbery. *Id.* at 972.

■ However, the admission of mug shots is not always reversible error. In *Hunter v. State* (1986), Ind., 492 N.E.2d 1067, 1070, the exhibits at issue were frontal photographs of the defendant, cropped off at the shoulders, with no prison numbers or legends visible. This Court held that admission of those photographs was not error. *Id.* Similarly, in *Head v. State*, 443 N.E.2d 44, 58, use of such photographs was approved where the State had securely covered the law enforcement inscription at the bottom of the picture, there was no evidence of prior criminal activity, the photograph included only a frontal view of the defendant from his shoulders upward, without a companion profile shot, and no chain or other police identification plate was visible.

James argues that he was prejudiced because information relating to criminal history appeared on the back of the photographs. We note first that James made no objection to the information on the back of the photographs at trial, thus raising the question of whether this objection has been waived. *See Ingram v. State* (1989), Ind., 547 N.E.2d 823, 829. Assuming there has been no waiver, prior decisions make clear that the prejudice to be avoided is the suggestion that the *defendant* has a criminal history. *See Menifee v. State* (1987), Ind., 512 N.E.2d 142, 144; *Head*, 443 N.E.2d at 57. In James' case, the back of his photograph contains the following: Victor, Victory, B, M, 4622, FTA, and 9, followed by a hyphen and what appears to be the left

half of a zero. We find no prejudicial information on the back of James' photograph. Even if, as James urges, "FTA" stands for "failure to appear" and, therefore, connotes some type of criminal history, it is unlikely that jurors would recognize this abbreviation. In short, we find nothing visible to the jury in the exhibit that would inform them of a prior criminal record.

### The Change of Venue Was Proper

■ James next argues that the trial court erred in refusing to name non-adjoining counties to the panel of receiving counties in connection with his motion for change of venue. James contends that because two of the three counties designated as receiving counties had low minority populations, he was denied the right to an impartial jury. We do not agree.

James moved for a change of venue from LaPorte County, where the crime was committed, on account of pre-trial publicity. According to evidence James presented to the trial court, Americans of African descent comprise twenty per cent of La-Porte's population. The three counties surrounding LaPorte County are Porter and Stark Counties, both of which have a minority population of less than one per cent, and St. Joseph, the minority population of which is unknown. Essentially, James argues that he is entitled to change of venue to a county with a population of Americans of African descent higher than one per cent. Thus, he asserts, he would not be able to receive a trial by an impartial jury in either Stark or Porter counties.

■ James correctly notes that Indiana Criminal Rule 12 permits the trial judge before whom an application for a change of venue from the county is pending to eliminate a county from the list of counties to be submitted for striking if it appears that the grounds for a change of venue also exist in one or more of the adjoining counties. The decision as to whether to add non-adjoining counties to the panel of receiving counties is within the discretion of the trial court, and will be reversed only for an abuse of that discre-

tion. *McDaniel v. State* (1978), 268 Ind. 380, 382, 375 N.E.2d 228, 230. On this record, we find nothing to suggest that such an abuse occurred. The issue of the racial composition of the jury, when raised by a defendant, requires a demonstration of purposeful discrimination against that racial group. *Smith v. State* (1984), Ind., 465 N.E.2d 1105, 1115. The defendant bears the burden of showing that the discrimination was due to a systematic exclusion of that particular group. *Id.* Absent such purposeful discrimination and systematic exclusion, defendants' claims relating to the racial composition of jury panels have not been recognized. *See Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579.

James claims that by submitting the current census figures for Porter and Stark counties, he proved that he would not receive a trial by an impartial jury in either of those counties. We do not agree. We find nothing in the record to suggest that the trial court's decision to follow the mandates of Criminal Rule 12 in any way demonstrated purposeful discrimination or systematic exclusion of Americans of African descent from juries.

■ James also argues that the trial court erred in failing to require the prosecutor to articulate a non-discriminatory reason for striking St. Joseph County from the list of receiving counties. James analogizes his situation to that of the racially-motivated exclusion of jurors via peremptory challenges as discussed in *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. James claims that LaPorte County prosecutors systematically strike St. Joseph County as a receiving county, and that by doing so, the LaPorte County Prosecutor's office effectively and purposely excludes Americans of African descent from serving as jurors in a case with a defendant of the same heritage. We need not decide today whether such an analogy could ever be appropriate. In this case, James has not shown any such systematic exclusion as discussed in *Batson*. The record upon which James relies to support his claim indicates that, of the three

cases in which venue had been granted from LaPorte to St. Joseph County, St. Joseph County had been chosen as the receiving county in one. Of the remaining two, one case was venued to Porter County and one to LaPorte County. We find no particular pattern of systematic exclusion. Inasmuch as the burden of proof rests with James, we find that he has not sustained it.

### Conclusion

Accordingly, we affirm the conviction for felony murder, reverse the death penalty sentence, and remand the case to the trial court for either a new death sentence determination or the imposition of a sentence of a term of years.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.