**Claire JOHNSON, David Love, and Michael Suhy, Appellants–Defendants,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A03–9402–CR–55.

Court of Appeals of Indiana.

Dec. 18, 1995.

Rehearing Denied March 13, 1996.

---

Bruce Carr, Robert J. Henke, David Taylor, Carr & Henke, Lake Station, for Appellants.

Pamela Carter, Attorney General, Janet L. Parsanko, Geoff Davis, Deputy Attorney Generals, Indianapolis, for Appellee.

## OPINION

HOFFMAN, Judge.

Appellants-defendants Claire Johnson, David Love, and Michael Suhy (collectively "defendants") appeal their convictions for obstructing pedestrian traffic, Class B misdemeanors, and criminal trespass, Class A misdemeanors. The facts relevant to appeal are summarized below.

On the morning of March 20, 1993, employees of the Merrillville, Indiana Planned Parenthood Clinic [1] (Clinic) arrived at work to find a group of individuals blocking the doors and walking around the Clinic. According to them, they were attempting to educate Clinic patients regarding the dangers surrounding abortion procedures and to stop any abortions which may have been scheduled that day. As a result of their efforts, both employees and patients were denied access to the building. The Clinic did not open.

Soon thereafter, police were summoned to the scene. Upon arrival, police discovered approximately 200 individuals in front of the Clinic. A number of individuals were also blocking the Clinic doors. Over a public address (PA) system the group was generally instructed and those blocking the doors were personally instructed, that the Clinic was located on private property, they were trespassing, and if they did not leave the premis-

---

1. Events relevant to this appeal also occurred at the Planned Parenthood Clinic in Gary, Indiana on March 18, 1993.

es immediately, they would be arrested. No one left.

The police then arrested those persons blocking the doors to the Clinic. During arrest, some individuals stood when police approached. Some were shackled to concrete and steel devices. Others kneeled, sat down, passed out literature, or made themselves limp while police attempted to handcuff and carry them to police and fire vehicles.

In total, 27 individuals were tried for events occurring at the Clinics. The defendants were among those convicted of obstructing pedestrian traffic and criminal trespass. For purposes of sentencing, the 27 individuals were placed in three groups: A, B, and C. Defendants were placed in Group A. As such, the trial court sentenced them each to one year imprisonment and a $5,000.00 fine for their criminal trespass convictions. For their convictions for obstructing pedestrian traffic, the trial court sentenced them to a 180–day jail term, and a $500.00 fine. The sentences, which were to be served consecutive to one another, were suspended. The trial court also placed defendants on a two-year probationary term; ordered them to perform 500 hours of community service at a local hospital or care center; and as part of an eight-hour community service project, ordered them to attend a reproductive health lecture sponsored by Planned Parenthood. Pursuant to the order, any defendant refusing to attend the eight-hour lecture was required to spend a day in jail for each hour of the lecture missed. Defendants appeal their convictions.

On appeal, they raise several issues which we consolidate into six:

(1) whether error occurred in the manner in which they were identified at trial;

(2) whether the trial court erred in ruling on certain discovery matters;

(3) whether the trial court violated their constitutional rights by imposing the lecture requirement;

(4) whether the trial court erred in conducting an *ex parte* communication with the prosecution;

(5) whether the trial court erred in excluding certain evidence and an instruction on the defense of necessity; and

(6) whether the trial court erred in imposing restitution.

Officer William Poling was present at the scene and video taped events as they occurred. At trial, using his recollection, the video tape he had made, individual mug shots taken by him, and a photograph negative log sheet, he identified defendants. On appeal, defendants contend the manner in which he did so was impermissibly suggestive.

■ Due process of law requires suppression of testimony concerning an out-of-court identification when the procedure employed was unnecessarily suggestive. *Bell v. State* (1993), Ind., 622 N.E.2d 450, 454. The trial court must determine whether the confrontation was so impermissibly suggestive as to create a danger of an "irreparable mistaken identification." *Id.* In this analysis, the totality of the circumstances of the case is reviewed. *James v. State* (1993), Ind., 613 N.E.2d 15, 27. Factors to be considered are: (1) the opportunity of the witness to view the defendant at the scene of the crime, (2) the degree of attention given by the witness, (3) prior descriptions given by the witness regarding the defendant, and (4) the level of certainty illustrated by the witness. *Id.*

■ Defendants attack *inter alia* the propriety of a meeting during recess between Officer Poling and the prosecution which allowed him to review his video tape to refresh his recollection. In sum, they claim Officer Poling received coaching on his identifications. However, the record discloses that during this meeting, Officer Poling held the television remote control, paused the tape periodically on his own, and by using photographs he had personally taken of defendants, refreshed his ability to make identifications. Further, while this was occurring, the prosecution took notes but did not convey to him whether his identifications were accurate. Moreover, at trial, Officer Poling denied that prosecutors "took [him] through the tape" or told him how to answer questions posed to him.

To show undue suggestiveness, defendants also point to the existence of colored dots on the mug shots taken by Officer Poling. They argue the dots were used to steer him to make certain identifications. The record shows the dots were used by the prosecution merely for their own organizational efforts. Officer Poling stated he had no knowledge of their purpose. Further, there is no evidence he relied on them in making any identifications. *See Thomas v. State* (1987), Ind., 510 N.E.2d 651, 653 (defendant not entitled to mistrial based on alleged coaching where witness not aware of suggestive gestures and no showing by defendant he was placed in grave peril as a result).

At trial, several witnesses stated only those individuals blocking the Clinic doors were taken into custody. The record further discloses the suspects were then promptly transported to the Street Department Garage[2] for booking procedures. As noted above, Officer Poling was not only present at the scene of the crime and video taped the events occurring there, but he also immediately followed other officers to the Garage where he photographed each individual suspect and personally documented the arrests through use of a photograph negative log sheet prepared by him.

Both Suhy and Johnson were on the video tape and identified in court by Officer Poling. Although Love was not on the video tape, Officer Poling stated he remembered seeing him at the Clinic doors and photographing him at the Garage.

Defendants also argue no one personally witnessed them committing their crimes and that mere presence at the arrest site is insufficient to sustain their convictions. While defendants are correct to note arrest alone is insufficient to establish guilt, they also appear to misunderstand both the nature of the evidence against them and the gravamen of their crimes.

A person who does not have a contractual interest in property commits criminal trespass when he or she "(a)(2) ... knowingly or intentionally refuses to leave the real property of another person after having been asked to leave by the other person or his agent" or "(a)(4) ... knowingly or intentionally interferes with the possession or use of the property of another person without his consent." IND.CODE § 35–43–2–2 (1993 Ed.). It is not readily apparent what conduct above and beyond this defendants contend is necessary to sustain their convictions. However, it is evidence of their uninvited presence at the Clinic, not their arrests there, which supports a finding of their guilt. That the arrests occurred at the same site of the trespass is merely coincidental. The other arguments raised by defendants in the area of identification merely go to the weight of Officer Poling's testimony, not its admissibility, and do not amount to error.

Next, citing numerous instances of alleged misconduct by the prosecution, defendants complain the trial court erred in ruling on certain discovery matters. However, defendants simply present an array of conclusory statements, none of which amount to a successful showing that the outcome of their trial was prejudiced in any manner. *See Jenkins v. State* (1993), Ind., 627 N.E.2d 789, 798–799 (absent showing of clear violation of broad discretion in discovery matters and resulting prejudice therefrom decision of trial court will not be disturbed).

Defendants also complain the trial court erred in its imposition of sentence. Initially, they argue the lecture requirement is an attempt at governmentally imposed "reprogramming" in violation of their First Amendment rights to freedom of religion, speech, and association.[3]

Probation is a "matter of grace and a conditional liberty that is a favor, not a right." *Million v. State* (1995), Ind.App., 646 N.E.2d 998, 1002. Accordingly, a trial court is granted broad discretion in establishing conditions of probation in order to safeguard the general public and to create law abiding

---

2. This is a facility located behind the Merrillville police station.

3. Along with their constitutional arguments, defendants raise a civil rights claim pursuant to 42 U.S.C. § 1983. Yet, they fail to make cogent argument in support. The issue is waived. *See* Ind.Appellate Rule 8.3(A)(7).

citizens. *Patton v. State* (1991), Ind.App., 580 N.E.2d 693, 698, *trans. denied.* Conditions of probation which intrude upon constitutionally protected rights are not necessarily invalid. *Id.; see U.S. v. Turner,* (10th Cir.1995), 44 F.3d 900, 903 (prohibition against harassing, intimidating or picketing in front of family planning facility was valid condition of probation). Rather, to discern whether a condition is unduly intrusive on constitutional rights, three factors are balanced:

"(1) the purpose sought to be served by probation; (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be accorded to probationers; and (3) the legitimate needs of law enforcement."

*Patton,* 580 N.E.2d at 698 (Citation omitted.).

■ Defendants maintain the lecture provision violates the Establishment Clause of the First Amendment to the United States Constitution because it either favors another religion over theirs, or in the alternative, favors the existence of non-religion over their religion. However, a state action does not violate the clause if it: (1) has a secular purpose, (2) does not have as its primary or principle effect the advancement or inhibition of religion, and (3) does not foster excessive entanglement with religion. *Lemon v. Kurtzman* (1971), 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (commonly referred to as the *"Lemon* Test"). An analysis of the entanglement prong of the *Lemon* Test requires the balancing of three factors: (1) the character and purpose of the religious institution benefitted, (2) the nature

of the aid, and (3) the resulting relationship between governmental and religious authorities. *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112, 29 L.Ed.2d at 757.

■ At first glance, it is apparent that no Establishment Clause violation exists here. Planned Parenthood is a purely secular organization. Inasmuch as Planned Parenthood does not affiliate itself with any religion or faith, the lecture provision does not amount to a governmental choice between two religions. Defendants' alternative argument that since Planned Parenthood is not a religious entity, it advocates a "belief in no religion" is also wholly unsupported by the evidence. That Planned Parenthoood offers its family planning services to the general public without inquiry into religious faith, again means it is religiously neutral or purely secular; it does not mean the organization opposes the existence of religious faith in general.

In their challenge, defendants similarly maintain that discouraging trespass can be achieved solely by education or a lecture on the unlawfulness of trespass alone. However, the existence of criminal attacks of the nature presented here, aimed specifically at family planning facilities such as Planned Parenthood, is a unique and recurrent problem facing our modern criminal justice system. Both the occurrence of and the increase in attacks in recent years has spurred nationwide judicial concern and Congressional action. For example, by enacting the Federal Access to Clinic Entrances Act (FACE) in 1994,[4] Congress not only recognized the gravity of this type of criminal misconduct,

---

4. The purpose of FACE being the protection of those seeking the service of reproductive health facilities and religious institutions, in pertinent part, the legislation provides for civil and criminal penalties to be imposed on any one who:

"(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; or

\* \* \* \* \* \*

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because

such facility provides reproductive health services...."

18 U.S.C. § 248(a)(1) and (3). Pursuant to FACE, penalties are exacted depending upon both the severity and frequency of violations. For instance, a first-time offender may be confronted with a fine. Also, he or she may be imprisoned for a term not to exceed one year. For a subsequent offense, a fine of $25,000.00 may be assessed. If bodily injury results from conduct prohibited by the act, a term of 10 years' imprisonment may be imposed. Alternatively, if death results, an offender may be imprisoned for life. *See* 18 U.S.C. § 248(b)(c). In addition to criminal penalties, civil remedies are available to "any aggrieved person" under the act. *See* 18 U.S.C. § 248(c).

but also identified it as having a particular manner of execution and a specific type of victim as its target, thus necessitating specific attention and heightened punishment. *See* 18 U.S.C. § 248.

In designing the sentencing order, the trial court made a similar determination as to the peculiar nature of defendants' misconduct and likewise acknowledged the need for specific deterrence of future acts. Many of the 27 convicted individuals had engaged in criminal activity against family planning facilities in the past. No defendant expressed remorse for his or her actions. Further, no one voiced a willingness to cease similar criminal activity in the future. Moreover, the trial court explained the lecture was not meant to alter anyone's religious beliefs or individual stance on the abortion issue. Rather, the trial court expressed a desire that attendance would accomplish the deterrence goal by apprising the defendants of the wide variety of services, above and beyond abortion, offered by family planning facilities such as Planned Parenthood.

 In a related argument, defendants contend the lecture provision is a violation of the Free Exercise Clause. In this context, "[a] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye v. City of Hialeah* (1993), 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489. The crux of defendants' argument here is that the trial court has singled them out for special "hostility in sentencing" based solely on their religious beliefs and practices. More specifically, defendants assert the order does not pass the neutrality and general applicability test of *Hialeah* because other non-religiously mo-

tivated defendants committing similar crimes would not be required to attend such a lecture. They offer no compelling evidence in support of this contention. To the contrary, and supporting a finding that deterrence was the trial court's motivation for the lecture provision, the record shows first-time offenders who were also involved in the attack against the Clinics, sentenced in Group "C," and who similarly proclaimed religious motivations for their criminal actions, were not required to attend the session as part of their sentences.[5]

 Defendants' assertions that their freedoms of speech and association were violated are likewise without merit. Convicted individuals do not enjoy the same constitutional protections as law-abiding citizens. In the context of these constitutional freedoms, a state action is valid if reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz* (1987), 482 U.S. 342, 349, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282, 290. As noted earlier, being a valid deterrence measure, the lecture provision is reasonably related to such interests. *See U.S. v. Adderly* (5th Cir.1976), 529 F.2d 1182 (ordering that probationer associate with law-abiding citizens only held valid); *Malone v. U.S.* (9th Cir.1974), 502 F.2d 554, 556–557, *cert. denied* (1975), 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (probation condition requiring probationer not to associate with Irish political groups held valid); *Birzon v. King* (2d Cir.1972), 469 F.2d 1241, 1243 (argument that condition ordering probationer to associate only with those not engaging in criminal activity violates freedom of association right held frivolous); *cf. State v. Friberg* (Minn. 1989), 435 N.W.2d 509, 517 (condition on probation prohibiting abortion protesters from being 500 feet from clinic did not unduly restrict First Amendment rights).[6]

---

**5.** For these same reasons, the defendants have failed to show an equal protection violation. *See State v. Costas* (1990), Ind., 552 N.E.2d 459, 461–462 (no equal protection violation exists where claimant fails to prove either facial discrimination or that otherwise constitutional law is administered by state official in discriminatory fashion as to particular class of citizens).

**6.** Defendants' briefs are replete with emotionally charged, yet internally inconsistent and incogent

arguments. For instance, defendants analogize the lecture requirement to having convicted domestic batterers undergo psychological reprogramming at the hands of radical feminists. We reject the implied notion that only radical feminists oppose spousal abuse. Also ironically, defendants ardently claim the right to use illegal and physically obstructive efforts to "educate" women on the dangers of abortion and to prevent them from seeking the legally protected

Approximately 200 individuals were present at the Clinic and joined in the obstruction efforts. As a result, considerable law enforcement personnel and specialized tools were needed to control the crowd and to apprehend those blocking the doors. Jerry Walsh, Assistant Chief of the Merrillville Police Department, stated he sent between 20 and 30 officers to the scene. Lieutenant Ryan Wagner of the Gary Police Department said approximately 19 officers were needed to address the problem and, thus, other areas of the city were left unattended.

Kevin Gibson of the Gary Fire Department explained that many suspects shackled themselves by their arms, legs, and necks to steel and concrete blocks, with key or padlock devices attached, and intertwined their bodies around each other. Gibson stated one particular contraption was so heavy that 20 men were unable to lift it. The lecture requirement was a valid condition of probation. *See Patton,* 580 N.E.2d at 698.

 Sua sponte, we address one additional issue regarding sentencing. *See Carman v. State* (1985), Ind., 473 N.E.2d 618, 620 (erroneous sentence may be corrected sua sponte). The record reveals defendants' sentences are excessive in violation of *Smith v. State* (1993), Ind., 621 N.E.2d 325. IND. CODE § 35–50–3–1 (1993 Ed.) allows a sentence for a misdemeanor to be suspended and provides that the trial court may place a probationer "on probation ... for a fixed period of not more than one (1) year" for each offense. However, the *Smith* court instructs that in sentencing on a misdemeanor conviction, a prison sentence, the imposition of probation, or any combination of the two may not exceed the maximum term for the conviction. *Id.* at 326.

The trial court imposed a two-year probationary term on each defendant; though combined, the maximum consecutive sentence available for these misdemeanor convictions is one year and 180 days' imprisonment. *See* IND. CODE § 35–50–3–2 (1993 Ed.) (one-year maximum sentence for Class A misdemeanor); IND. CODE § 35–50–3–3 (1993 Ed.) (180–day maximum sentence for Class B misdemeanor). In addition to the original sentences and without a provision for good credit time, the trial court also ordered each defendant spend one day in jail for each hour of the lecture missed. Accordingly, we now modify the sentences as follows: one-year probationary terms are imposed upon each defendant for their criminal trespass convictions; consecutive to these terms, 180–day probationary terms are imposed upon each defendant for their obstructing pedestrian traffic convictions; and defendants shall receive good credit time against their sentences for any time spent in jail as a result of their failure to attend the lecture.

 Citing to Ind. Appellate Rule 8.3(E), defendants attempt to incorporate the arguments of their remaining issues from a separate appeal.[7] As to these issues, no argument is provided in their brief. While App.R. 8.3(E) allows for the adoption of arguments from briefs of cases involving more than one appellant or appellee, or in the case of consolidated appeals, it does not contemplate the adoption by reference of the contents of briefs from *separate* appeals. *See Stetzer v. State* (1995), Ind.App., 658 N.E.2d 652. Inasmuch as defendants failed to support these remaining issues with cogent argument, they are waived. *See* App.R. 8.3(A)(7).

Affirmed in part and modified in part.

GARRARD and RUCKER, JJ., concur.

procedure. At the same time, they vehemently oppose the opportunity to listen to, in a peaceful and structured manner, other viewpoints on the topic as a condition of probation and as an alternative to incarceration where their misconduct warrants a harsher sentence. Further, we disagree with their assertions that asking a convicted defendant to hear other aspects of an issue which essentially drives him to commit a specific crime is in any way akin to either racial hatred or cultural hatred of the type which occurred in Nazi Germany.

7. Defendants were among 27 individuals with related appeals pending before this Court. To accommodate the 27 defendants, the cases were consolidated into six separate appeals. This number was chosen because defense counsel assured this Court that different issues existed in each of the six cases.