ATTORNEY FOR APPELLANT

S. Neal Ziliak
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Gregory  F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Jun 23 2009, 2:16 pm

CLERK
of the supreme court,
court of appeals and
tax court

## In the
## Indiana Supreme Court

No. 29S00-0901-CR-1

JUAN C. LUCIO,                                   *Appellant (Defendant below),*

v.

STATE OF INDIANA,                        *Appellee (Plaintiff below).*

Appeal from the Hamilton Superior Court, No. 29D01-0704-MR-47
The Honorable Steven R. Nation, Judge

On Direct Appeal

**June 23, 2009**

**Dickson, Justice.**

The defendant, Juan Lucio, seeks reversal of his convictions for two counts of Murder and one count of Conspiracy to Commit Murder and the accompanying two sentences of life imprisonment without parole and one sentence of fifty years arising from his role in the April, 2007 deaths of Rebecca Payne and George Benner in Carmel, Indiana.  In this direct appeal, he presents a single issue, arguing that the trial court erred in denying his request for a mistrial when, in response to a juror-submitted question, a witness violated a pretrial order by testifying that she thought the defendant had met the alleged co-conspirator and murder triggerman in a county jail.  We affirm the trial court.

The trial evidence favorable to the verdict indicated that the defendant was recruited by Toby Payne to kill Payne's estranged wife Rebecca Payne, and her boyfriend, George Benner. Toby had given the defendant a key to Rebecca's house and a map, and promised him $100,000 from a life insurance policy in return for the killing. The defendant, in turn, recruited Kyle Duckworth to drive him to Rebecca's house in exchange for $200 or a quarter-pound of marijuana. Originally, the defendant planned to be the shooter, but later changed his mind and recruited Anthony Delarosa to be the triggerman. On April 2, 2007, Duckworth drove the defendant and Delarosa to Rebecca's house. The defendant gave Delarosa a gun, and Delarosa entered the house but returned and said that Rebecca was not home. The men agreed to try again later. On April 4, the defendant called Duckworth to pick him up, called Delarosa to ask if he was ready, and called Toby Payne to inform him they were trying again. The three men drove to Rebecca's home, the defendant again gave Delarosa a gun, and Delarosa entered the house and fired the fatal shots. When police had questioned him during their investigation, the defendant first admitted that Toby Payne had given him a key to the house and asked him to kill Rebecca, but later claimed that they were supposed to scare Rebecca and extort money from her, that Delarosa told him where to go, that he did not know Delarosa had a gun, that he did not know why Delarosa was extorting money from her, and that he and Duckworth were supposed to get $200 each for driving.

Before the defendant's jury trial began, the defendant moved to prevent the introduction of evidence regarding aspects of his criminal record, including arrests, convictions, pending charges, and periods of incarceration. At a pretrial hearing on the motion, the State objected to the extent the motion would preclude it from offering proof that the defendant and two alleged co-conspirators had spent time together and corresponded while in the Boone County Jail. The court ruled that the State could present evidence that the men had associated during that time period but granted the defendant's motion with respect to the specific location as well as "why these individuals were in the Boone County Jail." Appellant's App'x at 208.

At trial, the State called as a witness the defendant's former girlfriend, Tara Cassada. Following direct and cross-examination, the trial court, away from the jury's presence, consi-

dered several questions that the jurors submitted pursuant to Jury Rule 20(a)(7).[1] In one of these questions, a juror asked, "How were Tony Delarosa and Juan connected, i.e., drugs, work, and for how long have they been acquainted?" Tr. at 478-79. The prosecutor and defense counsel agreed that the first half of the question could not be asked, but neither objected to asking how long the defendant and the co-conspirator had known each other. When proceedings were resumed in the jury's presence, the trial court posed several of the jurors' questions to the witness. As to the above specific question, the court rephrased the question to ask, "Now, between Tony Delarosa and Juan, how long have they been acquainted?" and the witness replied: "As far as I know they had met in Boone County Jail." Tr. at 483.

Defense counsel immediately moved for a mistrial, arguing that this testimony, though inadvertent and not an "evidentiary harpoon,"[2] was highly prejudicial both to his client's guilt and potential life sentence. Tr. at 484. The prosecutor confirmed that Ms. Cassada had been instructed not to mention the fact that the men had been in jail together; suggested that the court issue a curative instruction, strike the answer, and advise the jury not to consider the testimony in any way; and argued that "with the extent of overwhelming evidence that we've already presented in this case, . . . the Court can find that although this is certainly not a good thing, that it is harmless under all the circumstances . . . , with an admonishing instruction to the jury." Tr. at 486. The court agreed that the violation was unintentional and denied the mistrial motion. The court then asked if the defendant desired a limiting instruction and crafted one with the input of both parties. When the jury returned, the court instructed as follows: "Well, ladies and gentlemen, the last answer of the witness is hereby stricken from the record. You must not consider that evidence as to any matter before you for consideration. In fact, such matter is to be treated as though you have never heard of it. So that is the order of the Court." Tr. at 488.

---

[1] This rule provides that jurors "may seek to ask questions of the witnesses by submission of questions in writing."

[2] "An evidentiary harpoon involves the deliberate use of improper evidence to prejudice the defendant in the eyes of the jury." Williams v. State, 512 N.E.2d 1087, 1090 (Ind. 1987).

At the conclusion of all the evidence, the jury was instructed on vicarious criminal liability.[3] It found the defendant guilty on all three counts. In the subsequent penalty phase proceeding, the jury determined that the State had proved two charged aggravating circumstances— murder for hire and multiple killings, Ind. Code §§ 35-50-2-9(b)(4), (b)(8)—beyond a reasonable doubt, found that the aggravators outweighed the mitigators, and recommended that the defendant be sentenced to life in prison without parole. The trial court, following the jury's recommendation, sentenced the defendant to life without parole for the murder counts and imposed a fifty-year term for the conspiracy count, all sentences to run consecutively.

The defendant now contends that the trial court erred in denying his motion for a mistrial after Ms. Cassada's improper testimony. Because the trial court is best positioned to assess the circumstances of an error and its probable impact on the jury, "[t]he denial of a mistrial lies within the sound discretion of the trial court," and this Court reviews only for abuse of that discretion. Gill v. State, 730 N.E.2d 709, 712 (Ind. 2000). The overriding concern is whether the defendant "was so prejudiced that he was placed in a position of grave peril." *Id.* The defendant argues that Cassada's testimony placed him in grave peril during the guilt phase and during the penalty phase by creating the forbidden "bad person" inference, i.e., once a criminal always a criminal.

The dispute is not over the propriety of Ms. Cassada's testimony (which everyone agrees was improper), but rather about the trial court's failure to grant a mistrial. The remedy of mistrial is "extreme," Warren v. State, 757 N.E.2d 995, 998-99 (Ind. 2001), strong medicine that should be prescribed only when "no other action can be expected to remedy the situation" at the trial level, Gambill v. State, 436 N.E.2d 301, 304 (Ind. 1982). But the trial court immediately told the jury "not [to] consider that evidence as to any matter before you for consideration" and to treat it "as though you have never heard of it." Tr. at 488. This clear instruction, together with strong presumptions that juries follow courts' instructions and that an admonition cures any error, severely undercuts the defendant's position. Kent v. State, 675 N.E.2d 332, 336 (Ind. 1996); James

---

[3] Final Instruction No. 12 read that "[a] person who, knowingly or intentionally aids another person in committing or induces another person to commit or causes another person to commit murder is guilty of murder." Appellant's App'x at 327. *See* Ind. Code § 35-41-2-4 (Indiana's accomplice liability statute, under which a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense").

4

v. State, 613 N.E.2d 15, 22 (Ind. 1993); Szpyrka v. State, 550 N.E.2d 316, 317-18 (Ind. 1990); Pillow v. State, 479 N.E.2d 1301, 1306 (Ind. 1985); Davenport v. State, 464 N.E.2d 1302, 1308 (Ind. 1984); Beer v. State, 885 N.E.2d 33, 47-49 (Ind. Ct. App. 2008). Moreover, the parties agree that this was an inadvertent mistake by a civilian witness, that no other witness provided any evidence regarding the defendant's criminal record during the five-day trial, and that the State made absolutely no reference to this statement in its closing statement to the jury or at any other time during the trial. By all accounts the statement was fleeting, inadvertent, and only a minor part of the evidence against the defendant. See Jackson v. State, 518 N.E.2d 787, 789 (Ind. 1988); Coleman v. State, 490 N.E.2d 325, 328 (Ind. 1986). All of these factors persuade us that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

The defendant also argues that the materiality of resulting harm to him increased as the case moved into the penalty phase trial. He urges that the offending testimony created a forbidden inference that placed him in particularly great peril, which was not curable by the trial court's admonition.

That the State sought life imprisonment does not alter the analysis of whether the trial court was compelled to grant a mistrial. The statement did not prevent the defendant from receiving a fair trial, and the defendant cites no authority to establish that a statement which fails to place him in grave peril of being convicted of Murder and Conspiracy to Commit Murder gives rise to grave peril because of the potential punishment.

It is also significant that in the penalty phase trial, the jury was carefully instructed regarding the issues to be decided and directed not to consider any others. The instructions included the following:

> Before you may consider recommending life imprisonment without parole, you must unanimously find that the State has proven beyond a reasonable doubt:
> AGGRAVATING CIRCUMSTANCE NUMBER 1:
> On or about April 4, 2007, in Hamilton County, Indiana, Juan C. Lucio committed the murder of Rebecca Payne after having been hired to kill Rebecca Payne, in violation of I.C. 35-50-2-9(a) and (b)(4); and/or
> AGGRAVATING CIRCUMSTANCE NUMBER 2:

5

On or about April 4, 2007, in Hamilton County, Indiana, Juan C. Lucio committed another murder, to-wit, did kill George Benner, in violation of I.C. 35-50-2-9(a) and (b)(8).

*You are not permitted to consider any circumstances as weighing in favor of the sentence of life imprisonment other than the above stated aggravating circumstances specifically charged by the State in the Charging Information.*

Appellant's App'x at 413 (emphasis added). The defendant's criminal record was not at issue during the penalty phase and no evidence was presented on the matter. We find that the witness's inadvertent answer, particularly in light of the trial court's prompt admonishment and the prosecution's total avoidance of any further reference to the answer during the guilt and penalty phases of the trial, did not result in grave peril during the penalty phase.

Our conclusion that the trial court did not err in denying the defendant's mistrial motion is not altered by the fact that the witness's inappropriate answer occurred during a trial that then proceeded to a penalty phase at which the defendant was facing a sentence of life imprisonment without parole.

**Conclusion**

Concluding that the trial court properly responded to a witness's inappropriate answer to a jury question, and that the inadvertent answer was not thereafter used by the prosecution, we find no error in denying the defendant's motion for mistrial and therefore affirm the judgment of the trial court.

Shepard, C.J., and Sullivan, Boehm, and Rucker, JJ., concur.

6