**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SCOTT L. BARNHART**
Keffer Barnhart, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHERYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MEGAN RENEA MECUM, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A04-1401-CR-4 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Robert J. Pigman, Judge
Cause No. 82D02-1203-MR-286

**August 21, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Megan Mecum appeals her convictions for murder, Class D felony theft, Class A misdemeanor invasion of privacy, and Class C felony conspiracy to commit robbery. We affirm.

## Issues

Mecum raises two issues, which we restate as:

I.      whether the jury was properly instructed; and

II.     whether the admission of certain evidence was reversible error.

## Facts

In March 2012, twenty-one-year-old Mecum was married to forty-one-year-old Keith Vaughn, and they lived in Evansville. The couple's relationship could be volatile, and Vaughn had an order of protection against Mecum. Mecum was also involved in a romantic relationship with seventeen-year-old James Levi Mayhugh ("Levi"), who lived with his mother, Rachel Mayhugh. Levi's cousin and Rachel's nephew, Hubert Mayhugh, who is called J.R., also lived at Rachel's house with his girlfriend and three children. In early March, Mecum was at Rachel's house "quite a bit," and Levi, J.R., and Mecum were "always together." Tr. p. 214.

A few days before March 10, 2012, Mecum discussed with Levi and J.R. that she wished she could rob Vaughn and get away from him. Late on March 10, 2012, and in the early morning hours of March 11, 2012, Levi, J.R., and Mecum were out together. They went to a bar, where Mecum spoke with a friend of Vaughn's. Mecum blamed

Vaughn for her not being able to see her daughter and remarked that she would not care if he died. At approximately 3:00 a.m., J.R. saw a friend at a gas station and mentioned that he was having money problems and was thinking about robbing Vaughn because Mecum told him Vaughn had $40,000. J.R. left the gas station with Levi and Mecum in Mecum's SUV. At around 6:00 a.m., Levi called Rachel's house and wanted to speak to Mecum. Levi told Rachel to pray for him. Rachel found Mecum in the driveway in her SUV. Mecum's head was on the steering wheel, and her hand was shaking. Mecum left after she spoke with Levi, and Levi, J.R., and Mecum returned to Rachel's house around 7:00 a.m. As they were going upstairs to go to bed, J.R. told Rachel "that he had killed a mother f****r." Id. at 219. Rachel, who did not see any blood on J.R., laughed and told him "to take his killer ass upstairs and go to bed." Id.

That morning, Vaughn's neighbors found two security cameras, a DVR, two cordless phones, and two bloody knives in a bag near their trash cans and called the police. Because the phones were still within the range of their base, the police were able to link them to Vaughn's house. The police did a welfare check and, when they arrived at Vaughn's house, they noticed that all of the windows and doors were closed and locked, and there were no signs of forced entry other than a missing security camera. The police used a neighbor's key to get into Vaughn's house, where they found his body. Vaughn had been strangled and stabbed. It was later determined that Vaughn died of a stab wound to the neck. A DVR connected to the security system was missing from Vaughn's bedroom closet, and Vaughn's Rottweiler had been locked in a bathroom. A baseball cap with J.R.'s DNA on it was found in Vaughn's backyard.

3

Later that day, Levi told Rachel, "that wasn't my cuz momma, that wasn't my cuz and he said that he had seen a monster." Id. at 240. That same day, Rachel saw J.R. go into the backyard with a trash bag, and J.R. told a friend, while crying profusely, "I didn't mean to do it." Id. at 297. Levi asked the friend if she could sell a wedding ring for him.

When the police executed a search warrant at Rachel's house that day, they discovered recently burned clothing and what appeared to be a cell phone in the backyard of Rachel's house. The police interviewed Mecum, and she told them $80 had been taken from Vaughn's house. In the pocket of Mecum's jeans, the police found a key ring missing the key to Vaughn's house. The key was never recovered. Mecum was arrested and, while she was being booked and completing a suicide questionnaire, Mecum stated, "I just killed my f*****g husband what makes you think I won't kill myself." Id. at 365-66.

The State initially charged Mecum with murder, Class B felony armed robbery, Class B felony burglary, Class D felony theft, and Class A misdemeanor invasion of privacy. The State later amended the charging information to include a charge of Class B felony conspiracy to commit robbery resulting in serious bodily injury. A jury found Mecum guilty as charged. The trial court entered convictions on the murder, theft, and invasion of privacy charges and on the conspiracy charge, which it reduced to a Class C felony. Mecum now appeals.

## Analysis

### I. Jury Instruction

As part of the final instructions, Court's Instruction No. 20 instructed the jury:

A conspiracy does not need to rest solely on words giving rise to an express agreement, but may be inferred from acts and conduct of the persons accused done in pursuance of an apparent criminal or unlawful purpose in common between them. The conduct of the parties must be such that it supports the inference that there existed beyond a reasonable doubt an intelligent and deliberate agreement between the parties to commit the felony.

Each party to a conspiracy is responsible for all acts performed by his co-conspirators in furtherance of the conspiracy.

To constitute the crime of conspiracy, it is not necessary that the conspirators succeed in committing the felony.

App. p. 168. After deliberations began, the jury asked whether the logic on Instruction Number 20 applied to all charges or just the conspiracy charge and specifically referenced the second to last sentence of the instruction. The trial court discussed the issue with the jury and confirmed that the jurors had reread the instructions and that further instruction would aid in deliberations. The trial court then proposed rereading the final instructions with Court's Instruction No. 39, which provided:

Where two or more persons engage in the commission of an unlawful act; each person may be criminally responsible for the actions of each other person which were a probable and natural consequence of their common plan even though not intended as part of the original plan. It is not essential that participation of any one person to each element of the crime be established.

Id. at166. Outside of the presence of the jury, defense counsel objected to the additional instruction on the basis that "this issue was very well covered in the previous instructions that are already given to the jury . . . ." Tr. p. 468. The trial court overruled the objection.

5

The trial court then informed the jury it was going to reread the final instructions and give the jury a copy of the additional instruction. The trial court explained:

> As with all of the other instructions you're given, however, you must construe that instruction together with all the other instructions. You can't single out any one specific instruction for special consideration because as I explained, all the law in the case is not embodied in any one single instruction. So when you construe any of the instructions, you should construe them with all the other instructions given. But when we're finished rereading the instructions I will give you a copy of the one that has been added and you can take that back to the jury room with you with that admonition and use it during your deliberations.

Id. at 471. The trial court reread the final instructions and then stated:

> Again I admonish you that all the law in this case is not embodied in any one instruction. When you're reviewing this instruction or any other instruction you must construe it in conjunction with all the other instructions given as no one point of law would cover every aspect of the case.

Id. at 472.

On appeal Mecum argues that the trial court unduly emphasized the additional instruction and invited the jury "to ignore the prior instructions and focus on the additional instruction provided by the court." Appellant's Br. p. 6. This, however, is a different basis than the objection presented to the trial court—that the instruction was covered by the other instructions. "If Defendant failed to make 'a timely trial objection clearly identifying both the claimed objectionable matter and the grounds for the objection,' the claim of error is waived." Luna v. State, 758 N.E.2d 515, 518 (Ind. 2001) (quoting Scisney v. State, 701 N.E.2d 847, 849 (Ind. 1998)). More specifically, a defendant may not appeal the giving of an instruction on grounds not distinctly presented

6

at trial. Helsley v. State, 809 N.E.2d 292, 302 (Ind. 2004). Because Mecum objected to the instruction on the basis that it was covered by the other instructions and now argues that the manner in which the instruction was given unduly emphasized it, this claim of error is waived. See Luna, 758 N.E.2d at 518 (holding that the failure to state the ground for her objection that she asserted on appeal waived her ability to raise that issue).

Waiver notwithstanding, we review a trial court's manner of instructing the jury for an abuse of discretion. Inman v. State, 4 N.E.3d 190, 201 (Ind. 2014). Here, the trial court reread all of the instructions including the additional instruction and repeatedly admonished the jury to construe the instructions together and not to single out one instruction. There is a strong presumption that the jury follows a trial court's instructions and that an admonition cures any error. Lucio v. State, 907 N.E.2d 1008, 1011 (Ind. 2009). Accordingly, if this issue had been properly preserved, Mecum would be unable to establish that the trial court abused its discretion in its instruction of the jury.

## II. Admission of Evidence

Mecum argues that the trial court improperly allowed Rachel to testify that J.R. told her "that he had killed a mother f****r." Tr. p. 219. Even if this statement was not admissible pursuant to Indiana Evidence Rule 804(b)(3), which was the trial court's basis for admitting this testimony, any error in its admission was harmless. "Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party." Hoglund v. State, 962 N.E.2d 1230, 1238 (Ind. 2012). We look to the probable impact on the fact finder to determine the effect of the evidentiary ruling on a defendant's substantial rights. Id. "The improper admission is harmless error if the

conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction." Id.

Without specifying how, Mecum asserts that Rachel's testimony impacted the jury. We disagree. There was no dispute that Vaughn had been murdered or that J.R. was involved in the murder. In fact, the defense's theory was that Mecum was not involved in the plan to burglarize Vaughn's house. For example, in the opening statement, defense counsel asked the jury to "determine whether not you're going to hold [Mecum] as responsible as the two people that are truly responsible for committing this crime, Levi Mayhugh and J.R. Mayhugh." Tr. pp. 56-57. Thus, the testimony that J.R. said he killed Vaughn in and of itself did not establish that Mecum was involved in the crime.

Further, there was extensive evidence of J.R.'s involvement in the crime. For example, after the murder, Levi described his "cuz" as a monster, and J.R. was crying "profusely" and told a friend "I didn't mean to do it." Id. at 240, 297. Rachel testified that after the murder she saw J.R. carrying a garbage bag to her backyard, and police discovered that clothing and a cell phone appeared to have been recently burned in Rachel's backyard. Also, J.R.'s DNA was on a hat found in Vaughn's backyard.

As for Mecum's participation, there was evidence that Mecum, Levi, and J.R. had previously discussed robbing Vaughn, and the three of them were seen together over the course of the night. Moreover, the manner in which the security system was disabled, the confinement of Vaughn's dog, the absence of forced entry, and the fact that Vaughn's

8

house key was missing from Mecum's key ring strongly suggest that she was involved in the planning of the crime. This evidence taken with the booking officer's testimony that Mecum stated she had just killed her husband, leads us to conclude that any error in the admission of Rachel's testimony about what J.R. said was harmless.

## Conclusion

Mecum has not established that the manner in which the jury was instructed or the admission of Rachel's statement about what J.R. told her amounts to reversible error. We affirm.

Affirmed.

BRADFORD, J., and BROWN, J., concur.