## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 05 2017, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel J. Vanderpool
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General of Indiana
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Buddy J. Livesay,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | May 5, 2017<br><br>Court of Appeals Case No.<br>85A02-1610-CR-2462<br><br>Appeal from the Wabash Circuit Court.<br>The Honorable Robert R. McCallen III, Judge.<br>Trial Court Cause No. 85C01-1607-F5-777 |

**Darden, Senior Judge**

# Statement of the Case

Buddy J. Livesay appeals from his convictions after a jury trial of one count of Level 5 felony criminal confinement,[1] and one count of Level 6 felony domestic battery.[2] We affirm.

# Issues

Livesay presents the following issues for our review:

    I.    Whether the trial court abused its discretion by allowing the State to present the testimony of a rebuttal witness who was not included on the State's witness list before trial.

    II.    Whether the trial court abused its discretion by denying Livesay's motion for a mistrial when the victim interrupted closing arguments with an emotional outburst, instead choosing to admonish the jury.

# Facts and Procedural History

In July of 2016, Livesay, who was twenty-seven years old and unemployed at the time, lived with his mother, Rebecca, in her single-story home located in Urbana, Indiana. Gladys Kain, who was twenty-five years old, had been Livesay's girlfriend for almost five years by that time. She and her six-year-old son, Michael, lived with Livesay and Rebecca for approximately two years prior to the incident at issue.

---

[1] Ind. Code § 35-42-3-3(b) (2013).

[2] Ind. Code § 35-42-2-1.3(b) (2016).

[4] Gladys testified and described Livesay's behavior as controlling. According to her, he did not allow her to work and she was not allowed to have her own cell phone. If she purchased a phone, he would destroy it. He would not allow her to visit with her family and did not allow her to have her own personal friends. He also had issues with the type of clothing she wore. Gladys summed up his behavior as the result of having an insecure personality, which was revealed in episodes displaying his jealousy of others.

[5] At around 5:00 p.m. on July 7, 2016, Livesay, Gladys, and Michael got into Livesay's 1987 white Ford Ranger truck to visit Livesay's friends, Dave Shankle and John Garrett. The front seat of the truck had a bench seat. Livesay drove, Gladys sat in the passenger seat, and Michael sat between the two. The three frequently visited these friends who lived in Wabash, Indiana.

[6] After arriving at the house, the group stayed outside, playing basketball with Michael. The adults drank beer that John had purchased. At some point, Dave may have gone inside the house. Gladys, at some point, had to use the restroom after having been there for more than an hour and a half and consuming one beer. When she came out of the house, she found Livesay sitting in a chair next to the garage, while John and Michael played basketball. She could tell that he was unhappy.

[7] Upon seeing her, Livesay appeared angry and started yelling at Gladys. He shouted for all to hear that Gladys was a whore and that she was "probably in there f***ing him," meaning Dave. Tr. Vol. II, p. 70. He took a can of beer

that Gladys had intended to drink, squished the can, and poured the beer all over her shirt. *Id.* at 94. After that tirade, Livesay told Gladys that they needed to leave. Complying, she and Michael took their customary places on the front seat of Livesay's truck.

[8] As Livesay drove away from the gathering, several times he reached over young Michael's head to punch his mother Gladys' face with a closed fist. Gladys repeatedly begged Livesay to stop the truck to let her and Michael get out. She also opened the passenger door and screamed for help. Livesay responded by speeding up and driving through stop lights and stop signs to prevent them from getting out of the truck.

[9] David Harrell and his wife, Mary Beth, were outside their house watering flowers in the yard when they observed Livesay's truck drive past. The truck appeared to be moving at a high rate of speed, and they noted that the passenger door was somewhat open. Harrell heard a female voice from inside the truck screaming, "Help. Help. I need help." *Id.* at 40. Harrell ran inside the house to grab his cell phone and called 911 to report what he had seen and heard. He also provided a description of the vehicle and the direction it was traveling.

[10] Next, Harrell got into his car and drove several miles north of his house in the direction he saw the truck being driven. He was concerned that the passenger or passengers of the truck might have fallen out or had been allowed to exit the

truck without means of transportation. Harrell never saw Livesay's truck again and did not find anyone on the side of the road. He then returned home.

[11] Harrell shared with his wife his amazement that the passenger or passengers had not fallen out of the truck. He then decided to investigate to determine whether an object had fallen out of the truck through the open door. He walked to the intersection and found a white piece of paper in the center of the road along the path the truck had traveled. The paper was an old paystub bearing both a name and address.

[12] Harrell called the Wabash County Sheriff's Department to give them this new information and identified himself as the person who had called 911 earlier about the incident he had witnessed. An officer was sent to retrieve the evidence. The paystub exhibited Livesay's name and personal information.

[13] Meanwhile, Livesay had driven Gladys and Michael to Rebecca's house. Once they were inside, Livesay head-butted Gladys several times in front of Michael, who was upset and crying. Attempting to defend herself from Livesay, she picked up a candle holder—a sconce or a votive—and threw it at Livesay. Rebecca, who worked two jobs, one full-time and one part-time, was present during this incident and had been relaxing before the three arrived home.

[14] Gladys testified that she did not have a telephone and Rebecca would only allow her to use her cell phone when Livesay was away from the house. After the outburst, Livesay left the house at Rebecca's urging or insistence. Rebecca then allowed Gladys to call 911. Because Gladys was out of breath and crying,

she terminated the call due to her inability to speak. The 911 dispatcher called the number to follow up on the terminated call and spoke with Rebecca, who answered the phone.

When Livesay left the house, he left in his truck. Deputy Eric Riggs of the Wabash County Sheriff's Department, who had responded to Harrell's 911 call, observed a truck matching the description given to him by Harrell. The officer pulled Livesay's truck over. Another deputy proceeded to Rebecca's home and spoke with Gladys. Gladys had sustained a black eye and other injuries to her head and face. Photographs were taken of her injuries and admitted in evidence at trial.

Livesay was arrested and charged with criminal confinement and domestic battery, and the charge was enhanced due to the allegation that it was committed in the presence of a child. At the conclusion of the two-day jury trial, Livesay was found guilty as charged. The trial court sentenced him to five years in the Department of Correction for the criminal confinement conviction to be served concurrently with the conviction for domestic battery, for which Livesay received a two-year sentence. This appeal ensued.

## Discussion and Decision

### I. Rebuttal Witness and 911 Recordings

Livesay challenges the admissibility of the testimony of the State's rebuttal witness and the admissibility of the 911 recordings for which a foundation was laid during the rebuttal witness' testimony. He claims that the rebuttal witness'

testimony should have been excluded because she was not named on the State's pretrial witness list. If her testimony had been excluded, no foundation could have been laid for the admissibility of the recordings.

[18] A trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). Appellate review focuses on whether there was an abuse of that discretion. *Id.* We will reverse the trial court's decision only when admission of the evidence is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.*

[19] Additionally, a trial court is granted wide discretion in deciding whether to allow testimony from a witness not listed on a pretrial discovery witness list. *Liddell v. State*, 948 N.E.2d 367, 370 (Ind. Ct. App. 2011). "Although discovery matters are generally discretionary with the trial court it is ordinarily considered improper for a trial court to allow a witness who was not listed in discovery to testify unless the remedy of a continuance is granted to the other party to meet such testimony." *Mauricio v. State*, 476 N.E.2d 88, 94 (Ind. 1985). The exception to this rule is where a witness is brought in on rebuttal. *Id.*

[20] Prior to trial, the State provided the defense with copies of the 911 recordings. The recordings, which were later admitted during rebuttal as Exhibit 11, contained the first call that was terminated, and the dispatcher's call-back, re-establishing communication, this time with Rebecca. In the ensuing

conversation between Rebecca and the dispatcher, Rebecca can be heard saying the following:

> Rebecca:    My son..My son and his girlfriend I guess.  I am not sure exactly what happened other than it is apparent he must have smacked her and then he came in here and they're arguing and the next thing I know sconces are flying through the air. . .
>
> Dispatcher:  Is she injured?
>
> Rebecca:    Her eye.  She said he hit her in the eye before she got in the house.
>
> Dispatcher:  Does she need an ambulance?
>
> Rebecca:    No.
>
> Dispatcher:  Do you want officers?
>
> Rebecca:    Do you want an officer here or do you want me to take you to your sister's.  That's up to you dear.

Exhibit 11, 00:51-01:32.  The dispatcher, Darcy Corn, asked Rebecca if Livesay was still at the house.  Rebecca replied that he was not and that he must have, as she put it, run off again.  Corn indicated that Rebecca and Gladys should remain there and an officer would be sent to the address because a 911 call had been placed.

[21]   The only witness to testify for the defense was Rebecca.  During her testimony, however, which was just two months after the altercation, she testified factually different about the incident.  She testified that on the day of the incident she had to work only one of her two jobs, and that her shift ended between 2:30 and 3:00 p.m.  After coming home, she took a forty-five minute nap, did a few things around the house, talked with her employer at her part-time job about

future scheduling, and took a shower. She testified that Gladys was standing in the kitchen when she got out of the shower and that Gladys was yelling at her. She asked Gladys why her shirt was wet, and Gladys explained that Livesay had poured beer on her because he was upset that she was bringing an open container in his truck.

[22] Rebecca said that Livesay entered the house to contact a cousin in order to avoid arguing with Gladys any more. She testified that Livesay told Gladys not to argue with his mother. After that, he left the house. She stated that Gladys changed from her beer-drenched clothes and then made a couple of phone calls, or used the cell phone to send messages on Facebook. Rebecca testified that afterward, she and Gladys went out of the house to smoke a cigarette, at which time she told Gladys that she needed to find somewhere else to stay that night.

[23] Rebecca then testified that Livesay returned after being gone for thirty to thirty-five minutes. She stated that Gladys was still screaming and that Livesay was trying to keep his distance from Gladys. Rebecca was not scheduled to work her part-time job that evening. However, she claimed that Gladys was upset because both she (Rebecca) and Livesay were going to be gone from the house. She testified that she considered Michael to be her grandson; although she had other grandchildren, she spent more money supporting him since he lived with her. Rebecca further testified that she offered to take Gladys to the Sheriff's Department in order to obtain assistance at a shelter.

[24] Rebecca testified that as she was getting her keys to give Gladys a ride somewhere, she received a call on her cell phone, which she claimed she did not realize had been returned to her purse. She stated that she handed the phone to Gladys, who declined to take it. Subsequently, Rebecca answered the second telephone call and discovered it was a 911 dispatcher returning a terminated call. She denied telling an officer that Gladys asked to use the phone to call 911.

[25] When asked if there was any physical contact between Gladys and Livesay on July 7th, Rebecca testified that Livesay had acted like he was going to head-butt Gladys, but she believed he had not done so since Gladys did not move in response to his action. Rebecca then testified that the next thing that happened was Gladys throwing the candle holders at Livesay.

[26] Therefore, at the conclusion of Rebecca's testimony, her credibility became a critical issue because it contradicted not only the 911 recordings, which were previously disclosed to the defense, but Gladys' testimony as well.

[27] Before Corn's rebuttal testimony, the defense objected to her testimony on the basis that her name did not appear on the pre-trial witness list. In particular, the defense argued that the State had already cross-examined Rebecca and that "this goes more towards challenging her credibility than refuting any defense in this matter." Tr. Vol. II, p. 225. The trial court overruled the objection to Corn's testimony noting that, "She's not offering anything of substance. It's the content of the 911 calls, particularly the third one." *Id.* at 226.

[28] Corn testified and laid the foundation for the admission of Exhibit 11, the recording of the two 911 conversations. Livesay did not object to the admission of the recordings. The recordings were played for the jury and the State rested.

[29] In *Mauricio*, a rebuttal witness, who had not been revealed in discovery, was called to testify solely for the purpose of refuting the testimony of the defense's alibi witnesses. On appeal, Mauricio claimed that the State was aware of the rebuttal witness well before trial and wrongly failed to disclose her potential testimony to the defense. As is pertinent to the present appeal, the defense argued that a request for continuance would not have aided the defense because the specific purpose of the witness' testimony was to discredit the testimony of the alibi witnesses. The Supreme Court held that the trial court did not abuse its discretion by allowing this testimony because the purpose of calling a rebuttal witness is to respond to testimony presented by the defense. 476 N.E.2d at 94.

[30] In the present appeal, prior to trial, the State and the defense were aware of the substance of the 911 calls. Exhibit 11 was admitted into evidence without objection. Corn's rebuttal testimony primarily was limited to laying a foundation for the admission of the contents of the 911 calls. Further, to the extent she testified about the substance of those calls, her testimony was cumulative of the recordings, which were admitted without objection. The trial court did not abuse its discretion.

# II. Motion for Mistrial

[31] Next, Livesay argues that the trial court abused its discretion by denying his motion for mistrial, instead choosing to admonish the jury.

[32] The decision to grant or deny a motion for mistrial lies within the sound discretion of the trial court. *Isom v. State*, 31 N.E.3d 469, 480 (Ind. 2015). Upon review of the trial court's decision, we afford great deference to the trial court and review the decision solely for an abuse of that discretion. *Id.* The trial court is in the best position to assess the overall circumstances of an error and its probable impact on the jury. *Lucio v. State*, 907 N.E.2d 1008, 1010 (Ind. 2009). "The overriding concern is whether the defendant 'was so prejudiced that he was placed in a position of grave peril.'" *Id.* (quoting *Gill v. State*, 730 N.E.2d 709, 712 (Ind. 2000)). "The remedy of mistrial is extreme, strong medicine that should be prescribed only when no other action can be expected to remedy the situation at the trial level." *Id.* at 1010-11(citations and quotation omitted).

[33] During the State's rebuttal closing argument, the following statements/comments were made by the prosecuting attorney and Gladys:

> STATE: Bring your common sense in when you go back and start your deliberation and as you talk about this case. [Defense Counsel] said this case is important to Buddy Livesay. Sure it is. But it's also important for Gladys Kain.
>
> GLADYS: And my six-year-old son.

Tr. Vol. III, p. 11. At that point, the parties approached the bench and discussed the defense's requests that Gladys be removed from the court room and that a mistrial, or at least an admonishment be given. The trial court did not declare a mistrial, but admonished the jury to disregard Gladys' statement when reaching a verdict and removed Gladys from the court room.

[34] A defendant is entitled to a fair trial, not a perfect one. *Inman v. State*, 4 N.E.3d 190 (Ind. 2014). A properly submitted admonition of the jury is presumed to cure any error in the admission of evidence. *Isom*, 31 N.E.3d at 481. Further, on review, we must presume that the jury obeyed the trial court's instructions in reaching its verdict. *Id.* While the arguments of counsel are not evidence, Gladys, who had testified at trial, interrupted the State's rebuttal closing with an emotional outburst. However, the jury had already heard Gladys' testimony that her son witnessed both incidents. The removal of Gladys from the court room and admonishment to the jury was sufficiently curative and not an abuse of discretion.

# Conclusion

[35] In light of the foregoing we affirm the trial court's judgment.

[36] Affirmed.


Robb, J., and Barnes, J., concur.