

FILED

Apr 08 2019, 10:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Hickingbottom,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 8, 2019

Court of Appeals Case No.
18A-CR-627

Appeal from the
Miami Superior Court

The Honorable
J. David Grund, Judge

Trial Court Cause No.
52D01-1711-F5-109

**Kirsch, Judge.**

[1] Michael Hickingbottom ("Hickingbottom") was convicted after a jury trial of battery resulting in bodily injury to a public safety officer[1] as a Level 5 felony and was sentenced to six years. Hickingbottom appeals, raising the restated issues, which we find dispositive: whether the trial court abused its discretion when it denied his motion for mistrial based on the failure of the State to produce the Indiana Department of Correction ("DOC") manual that contains policies and procedures on the use of force by DOC officers.

[2] We reverse and remand.

## Facts and Procedural History

[3] Hickingbottom is an inmate at the Miami Correctional Facility ("the Facility"). When inmates first arrive at the Facility, they go through an orientation process, are familiarized with the rules and regulations of the Facility, and receive a booklet called the Miami Correctional Facility Rules and Regulations. *Tr. Vol. III* at 194-96; *State's Ex.* 4. The rules include that inmates are to be respectful to the staff and that all complaints are to be exhausted through the proper procedures. *Tr. Vol. III* at 198; *State's Ex.* 4. Rule 7 specifically instructs the inmates as follows: "Do what you are told by any staff member. If you feel the order is unjust, you may request to talk to a supervisor or pursue it via the grievance procedure after you have done as you have been instructed." *Tr. Vol.*

---

[1] *See* Ind. Code § 35-42-2-1(c)(1), (g)(5)(A).

*III* at 198-99; *State's Ex*. 4.  Hickingbottom signed the booklet on October 12, 2016.  *State's Ex*. 5.

[4] Inmates at the Facility receive three meals a day in the dining hall.  *Tr. Vol. III* at 106-07.  There are DOC officers assigned to the dining hall to control the area and ensure that food is not stolen.  *Id*. at 113.  Meals are passed to the inmates through windows, but inmates on crutches or in wheelchairs do not have to stand in line and can go to a gap between the windows to receive their meal.  *Id*. at 113-14.  Inmates have identification ("ID") cards that they are required to have on their persons at all times, and those inmates who are entitled to a special dietary meal have a special card to identify that distinction.  *Id*. at 114-15.  Inmates may not have another inmate's ID card with them.  *Id*. at 116.  Each inmate receives one tray per meal, and an inmate without an ID card is not permitted to eat.  *Id*.  If an inmate attempts to obtain a second tray of food, the inmate is asked to surrender the tray.  *Id*. at 117.  If the inmate does not surrender the tray, he is ordered to do so, and if he does not comply, the DOC officer has the option of writing a discipline report and removing the tray from the inmate.  *Id*.

[5] DOC officers are trained regarding when the use of force is appropriate and how to de-escalate a situation.  *Id*. at 118-20, 217-18.  The DOC has a force continuum, which outlines the various methods available in a "ladder of progression" to assist in attempting to resolve situations with inmates without moving into a situation of physically handling the inmate where both the inmate and the DOC officer could get injured.  *Id*. at 118.  This force

continuum is a ten-step continuum that, depending on the situation, moves from the concept of mere presence all the way up to the use of lethal force, if necessary. *Id.* DOC officers carry a duty belt with mechanical restraints, chemical agents, a radio, and a first aid kit, but they do not carry firearms. *Id.* at 122.

[6] On October 13, 2017, DOC Officer Larrie Fleenor ("Officer Fleenor") and DOC Officer Jabari Hillman ("Officer Hillman") were working in the dining hall and standing between the windows through which the food was served. *Id.* at 160-61, 224-25. Hickingbottom went up to an inmate who was on crutches, took the inmate's ID card, walked to the opening between the two windows to obtain a tray for the inmate, and handed Officer Fleenor the other inmate's ID card. *Id.* at 163, 226. At that point, another DOC officer working in the dining hall, told Officer Fleenor that the inmate on crutches had informed her that he was not going to eat that day. *Id.* at 226. Officer Fleenor told Hickingbottom that he could only get his own tray. *Id.* Officer Fleenor took the other inmate's ID card, looked at it, and put it in his pocket. *Id.* at 163, 226-27. Hickingbottom repeatedly asked Officer Fleenor why he had taken the ID card, and Officer Fleenor told him that he would give it back at the end of the meal and told Hickingbottom at least three times to step back. *Id.* at 163, 227. Hickingbottom became angry and reached into Officer Fleenor's pocket to retrieve the ID. *Id.* at 163. This action made Officer Fleenor angry, and he "smacked" Hickingbottom's hand away. *Id.* at 163. Vulgar language was used by both men – including a reference by Officer Fleenor to Hickingbottom as

"boy."[2]  *Id*. at 164; *Tr. Vol. IV* at 12, 28-30.  Hickingbottom "stepped into [Officer Fleenor's] face," getting within approximately five inches from the officer, and Officer Fleenor shoved him away.  *Tr. Vol. III* at 164-65, 227-28; *Tr. Vol. IV* at 12, 28.  Hickingbottom then began swinging at Officer Fleenor, punching him six or eight times.  *Tr. Vol. III* at 164-66, 228.  Other DOC officers arrived to assist, and they subdued Hickingbottom with a chemical agent.  *Id*. at 166, 177, 185.  As a result of the altercation, Officer Fleenor had a "busted lip," which required stitches, his nose and ears were bleeding, and he had abrasions to his head and arms.  *Id*. at 166, 177, 202; *State's Exs*. 6-11.

[7]     On October 25, 2017, Lorna Harbaugh ("Harbaugh"), the DOC officer in charge of investigations at the Facility, talked to Hickingbottom about the incident after he waived his *Miranda* rights.  *Tr. Vol. III* at 207.  Hickingbottom told Harbaugh that he was helping another inmate, Lottie, who was on crutches and was unable to obtain his own tray.  *State's Ex*. 18.  Hickingbottom said that Lottie gave Hickingbottom his ID, and Hickingbottom went to the gap between the windows to obtain Lottie's food.  *Id*.  Hickingbottom said that when he gave Lottie's ID to the DOC officer, the DOC officer snatched both Lottie's ID and his ID, and the DOC officer put them in his pocket.  *Id*.  Hickingbottom pointed to the DOC officer's pocket and said that his ID was there too and that he was only trying to help someone with crutches.  *Id*.  He and the DOC officer

---

[2] One of Hickingbottom's witnesses testified that, when a white man uses the word "boy" toward a black man, it is used to "belittle" or to try "to bring [him] down."  *Tr. Vol. IV* at 29-30.

exchanged words, the DOC officer pushed Hickingbottom, and Hickingbottom hit the DOC officer. *Id.* Hickingbottom told Harbaugh that it was his belief that the DOC officer initiated the physical contact. *Id.*

[8] The State charged Hickingbottom with Level 5 felony battery resulting in bodily injury to a public safety officer. Hickingbottom elected to represent himself throughout the proceedings. Hickingbottom filed a motion for a speedy trial, and a jury trial was set for January 31, 2018. Prior to trial, Hickingbottom filed a motion to dismiss and a motion to continue trial due to discovery issues. *Appellant's App. Vol. II* at 51-55. The discovery issues Hickingbottom raised were that the State only provided him with the video of the incident and statements regarding the incident but did not provide him with information he could use to impeach the witnesses such as prior criminal records and grievances against the witnesses. *Id.* at 54. The trial court denied both motions. *Id.* at 130-31.

[9] In a pretrial conference, the parties discussed proposed testimony by State's witness, Charles Williams ("Williams"), who the State said would testify regarding the policies and procedures of the Facility and what training the officers working at the Facility received. *Tr. Vol. II* at 106-07. Hickingbottom told the trial court that, in reference to Williams's testimony, he wished to have access to the DOC's "rulebook" for the DOC officers to determine if Williams's training tactics were correct. *Id.* at 107. The State responded that it was not sure if such a manual existed but that it was attempting to acquire information on the use of force, the force continuum, and any related standard operating

procedures or training related to what was at issue in the case if such information existed. *Id*. at 107-08.

[10] The day before trial was to begin, another pretrial hearing was held, and the parties again discussed the manual of the policies and procedures for the officers working in the DOC. *Id*. at 166. The State told the trial court that it was not able to obtain any manual because the Facility stated that an actual manual given to the DOC officers that explained procedures did not exist. *Id*. The State, therefore, told the trial court that it would not be offering into evidence any manual. *Id*. at 166-67. Hickingbottom insisted that he had observed a manual and continued to take issue with Williams's testimony regarding training procedures without Hickingbottom having access to the rules because it would hinder his cross-examination of Williams. *Id*. at 168. The trial court stated that the State would not be allowed to admit any written manual into evidence at trial and that Hickingbottom would be able to cross-examine Williams regarding the training of DOC officers. *Id*. at 169-70.

[11] At trial, the State presented the testimony of Williams, who was the Facility training coordinator, and he testified regarding the training that DOC officers received on when the use of force is appropriate. *Tr. Vol. III* at 117-18. He discussed how the DOC officers were trained to de-escalate a situation and about the force continuum that outlines the various methods available to attempt to resolve situations without resorting to a physical altercation. *Id*. at 118. He testified that this continuum contained ten steps that progressed from

mere presence of DOC officers to various kinds of physical force. *Id*. at 118-21. On cross-examination, Hickingbottom questioned Williams as follows:

> Q: Are there or is there a rulebook on how you should train other [DOC] officers?
>
> A: Can you define what you mean by "rulebook"?
>
> Q: A rulebook explaining the techniques or what's to be done during a tragic [sic] situation?
>
> A: Our training is governed by departmental policies and procedures. The division of staff training issues approved lesson plans that we use to train with.
>
> Q: Does the rulebook also explain how [DOC] officers should conduct themselves?
>
> A: Yes, there is information there about being -- acting in a professional manner.

*Id*. at 123.

[12]   After Williams's testimony, Hickingbottom moved for a mistrial, arguing that he had not received the manual explaining the conduct that DOC officers should engage in when dealing with inmates, particularly when faced with a situation similar to what occurred here. *Id*. at 127-28. He stated that he knew the manual existed because he had seen it before, and that although the Facility had told the State that a manual did not exist, Williams had testified that it in fact did. *Id*. at 128. Hickingbottom asserted that, without the manual, he was

not able to properly cross-examine Williams as to whether Officer Fleenor had acted improperly on the date of the altercation. *Id*. He claimed that he was, therefore, unable to adequately prepare a defense and was being denied a fair trial. *Id*. The trial court denied Hickingbottom's motion for mistrial. *Id*. at 149. The next day, Hickingbottom again questioned Williams, and Williams testified that no DOC officer manual existed – only training materials. *Id*. at 156. Harbaugh also testified that DOC officers do not have rule books or other manuals. *Id*. at 216. When Officer Fleenor testified, he compared DOC officers to daycare workers or babysitters and that the DOC officers give the inmates "recess," three meals," bedtime when they must be quiet, and timeout when they misbehave. *Id*. at 220.

[13] At the conclusion of the trial, the jury found Hickingbottom guilty of Level 5 felony battery resulting in bodily injury to a public safety officer. Hickingbottom filed several motions to correct error and a motion for a new trial due to newly discovered evidence, claiming that he had confirmation of the existence of the manual from other DOC officers at the Facility. *Appellant's App. Vol. III* at 61-64. The trial court denied all of these motions. Hickingbottom now appeals.

## Discussion and Decision

[14] Hickingbottom argues that the trial court abused its discretion when it denied his motion for mistrial based on the State's failure to produce the manual containing DOC's written policies governing the behavior of DOC officers

when they are involved in incidents, including arguments and physical altercations, with inmates. Hickingbottom contends that he repeatedly sought this manual and that the State never provided it to him. He asserts that, although the State indicated repeatedly that the manual did not exist, it later conceded it did exist but that it would not be disclosed by DOC. Based on the failure of the State to produce this manual, Hickingbottom claims his ability to prepare a proper defense was unfairly compromised, and he was deprived of a fair trial.

[15] The decision to grant or deny a motion for mistrial lies within the discretion of the trial court. *Ray v. State*, 838 N.E.2d 480, 486 (Ind. Ct. App. 2005) (citing *Francis v. State,* 758 N.E.2d 528, 532 (Ind. 2001)), *trans. denied*. The grant of a motion for mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error. *Lucio v. State*, 907 N.E.2d 1008, 1010-11 (Ind. 2009). "To prevail, the defendant 'must show that he was placed in a position of grave peril to which he should not have been subjected.'" *Ray*, 838 N.E.2d at 480 (quoting *Francis*, 758 N.E.2d at 532). The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id*. (citing *James v. State,* 613 N.E.2d 15, 22 (Ind. 1993)).

[16] Here, Hickingbottom was charged with battery resulting in bodily injury on a public safety officer, and at trial, he sought to present a defense that he used reasonable force in his altercation with Officer Fleenor because Officer Fleenor had not followed proper DOC procedures in his use of force. Prior to trial, Hickingbottom requested that the State produce the manual used by the

Facility, and the DOC generally, to set the policies and procedures on the use of force by DOC officers working for the DOC. The State never produced the manual and told the trial court that such a manual did not exist. However, at trial, Williams testified as to the training that DOC officers received regarding when the use of force is appropriate. *Tr. Vol. III* at 117-18. He discussed how the DOC officers were trained to de-escalate a situation and about the force continuum that outlines the various methods available to attempt to resolve situations without resorting to a physical altercation. *Id*. at 118. Williams testified that this continuum contained ten steps that progressed from mere presence of the DOC officers, to various kinds of physical force, all the way to lethal force. *Id*. at 118-21. On cross-examination, Hickingbottom questioned Williams as to whether there was a "rulebook on how you train other [DOC] officers" "explaining the techniques or what's to be done during a tragic [sic] situation." *Id*. at 123. Williams responded that the DOC officers' training is governed by departmental policies and procedures and that lesson plans are approved to use for training purposes. *Id*. Hickingbottom then asked whether the rulebook explained how DOC officers should conduct themselves, and Williams responded "Yes, there is information there about being – acting in a professional manner." *Id*.

[17]     Hickingbottom moved for a mistrial on the grounds Williams's testimony confirmed a rulebook or manual existed. Hickingbottom asserted that the manual was critical to his cross-examination of Williams and his overall defense that he was authorized to use the force he did against Officer Fleenor

because Officer Fleenor acted outside his official capacity when he forcefully shoved Hickingbottom. *Id.* at 127-128,131. Hickingbottom claimed the State's failure to produce the manual violated his rights under the Sixth Amendment and the Fourteenth Amendment and that he was unable to properly prepare a defense and was being denied a fair trial. *Id.* at 128, 131.

[18] Although the State represented that a manual detailing the use of force by DOC officers did not exist, the manual is referenced specifically, and included in part, on the DOC website. *See* https://www.in.gov/idoc/2830.htm (last visited Mar. 21, 2019). We take judicial notice of the existence of this manual of DOC policies and procedures pursuant to Indiana Evidence Rule 201(a)(2)(A), which states that a court may judicially notice the existence of published regulations of governmental agencies.[3] Subsection XIV on page 9 of Section 02-03-117 of the manual states,

> The use of physical force by Correctional Police Officers shall be in compliance with the use of force continuum in the administrative procedure for Policy 02-01-109, "The Use of Physical Force," . . . . Correctional Police Officers shall only use that amount of physical force necessary to control the situation and ensure the safety and security of all persons involved.
>
> Additionally, Correctional Police Officers shall comply with the administrative procedures for Policy 02-01-112, "The Use of

---

[3] Pursuant to Indiana Evidence Rule 201(c)(2), "the court must take judicial notice if a party requests it and the court is supplied with the necessary information. In his appellate brief, Hickingbottom specifically requests that we take judicial notice of the manual appearing on the DOC website.

Restraint Equipment," . . . and Policy 02-01-113, "The Use of Firearms and Chemical Agents."

https://www.in.gov/idoc/3265.htm (last visited Mar. 21, 2019). However, a link to Policy 02-01-109, as well as the other sections of the manual which may involve the use of force with inmates (Policies 02-01-112 and 02-01-113), is not included on the DOC website. *See id.*[4] Therefore, at all pertinent times, the manual existed and was available on the DOC website, even though certain polices were omitted.

[19] During pretrial proceedings and during trial, the State repeatedly told the trial court that it did not know of the existence of the manual and blamed the DOC for not providing it to the State. However, although the State may not have known of the existence of the manual prior to the trial, during trial, Williams's testimony confirmed the existence of the manual and established that DOC officers received training on when the use of force is appropriate and that they were trained to de-escalate a situation and to follow the ten-step force continuum to try to resolve situations without resorting to a physical altercation. *Id.* at 117-21. On cross-examination, Williams admitted that the training of DOC officers was governed by DOC policies and procedures and

---

[4] Although the State argues that the manual that appears on the DOC website was not available online at the time of Hickingbottom's trial because it was not issued until July 2018, we note that within the manual, the pertinent parts contain an effective date of September 1, 2013, which establishes that the manual was available at the time of Hickingbottom's trial, which began on January 31, 2018.

that such policies and procedures explained how DOC officers should conduct themselves. *Id*. at 123.

[20] The manual was critical to Hickingbottom's self-defense claim, which arose under Indiana Code section 35-41-3-2, providing in relevant part:

> (i) A person is justified in using reasonable force against a public servant if the person reasonably believes the force is necessary to:
>
> (1) protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force; [or]
>
> . . . .
>
> (3) prevent or terminate the public servant's unlawful trespass on or criminal interference with property lawfully in the person's possession, lawfully in possession of a member of the person's immediate family, or belonging to a person whose property the person has authority to protect.
>
> (j) Notwithstanding subsection (i), a person is not justified in using force against a public servant if:
>
> (1) the person is committing or is escaping after the commission of a crime;
>
> (2) the person provokes action by the public servant with intent to cause bodily injury to the public servant;
>
> (3) the person has entered into combat with the public servant or is the initial aggressor, unless the person withdraws from the encounter and communicates to the public servant the intent to

do so and the public servant nevertheless continues or threatens
to continue unlawful action; or

(4) the person reasonably believes the public servant is:

(A) acting lawfully; or

(B) engaged in the lawful execution of the public servant's official
duties.

Ind. Code § 35-41-3-2(i), (j).

[21] Hickingbottom, in requesting the manual, expected it to show what the proper policies and procedures were for DOC officers when using force and to establish that Officer Fleenor acted outside what was the proper use of force under the policies and, therefore, acted unlawfully. Hickingbottom's self-defense claim was based on an assertion that such unlawful actions by Officer Fleenor justified Hickingbottom's use of reasonable force against Officer Fleenor under Indiana Code section 35-41-3-2(i).

[22] Because he needed the manual to establish his claim of self-defense, Hickingbottom contends that he was denied his constitutional right to a fair trial. Essentially, Hickingbottom is arguing that a *Brady* violation occurred and that the alleged violation placed him in grave peril. Under *Brady v. Maryland,* 373 U.S. 83 (1963), the State is required to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment. *Hubbell v. State*, 754 N.E.2d 884, 893 (Ind. 2001). "Evidence is material under *Brady* 'only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Williams v. State*, 714 N.E.2d 644, 649 (Ind. 1999) (quoting *United State v. Bagley*, 473 U.S. 667, 682 (1985)), *cert. denied*, 528 U.S. 1170 (2000). "'A reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Bagley*, 473 U.S. at 682). If the favorable evidence becomes known to the defendant before or during the course of a trial, *Brady* is not implicated. *Id.*

[23] The manual was material to a determination of Hickingbottom's guilt because his claim of self defense rested on an assertion that Officer Fleenor acted unlawfully through his aggressive physical confrontation and the use of a racial slur toward Hickingbottom. *Tr. Vol. IV* at 69-72. In order to prove that Officer Fleenor violated the DOC policies and procedures in reference to the use of force and therefore acted unlawfully, Hickingbottom needed access to the manual that contained the pertinent policies and procedures. The State presented Williams's testimony regarding training procedures in lieu of the manual, but Hickingbottom was not able to effectively cross-examine Williams without having access to the manual. Without the manual, Hickingbottom was not able to determine whether Williams was accurately testifying regarding the DOC policies governing DOC officers and the use of force. "As the Indiana Supreme Court has recognized, 'the right to adequate and effective cross-examination is fundamental and essential to a fair trial [and] includes the right to ask pointed and relevant questions in an attempt to undermine the opposition's case, as well as the opportunity to test a witness's memory,

perception, and truthfulness.'" *Berkman v. State*, 976 N.E.2d 68, 77 (Ind. Ct. App. 2012) (quoting *State v. Owings*, 622 N.E.2d 948, 950 (Ind. 1993)), *trans. denied*, *cert. denied*, 571 U.S. 863 (2013).

[24] The State's failure to produce the manual affected the outcome of Hickingbottom's trial and undermined confidence in the outcome. The failure of the State to provide Hickingbottom with the manual probably impacted the jury's deliberations because the jury was not given the most important evidence regarding Hickingbottom's self-defense claim. Without the manual, Hickingbottom had no ability to substantiate his self-defense claim because it necessarily rested on proof that Officer Fleenor violated the manual's use of force provisions when dealing with Hickingbottom and, therefore, acted unlawfully. If Officer Fleenor used unlawful force or Hickingbottom reasonably believed Officer Fleenor imminently would use unlawful force, Hickingbottom contends he was justified in using reasonable force to protect himself. *See* I.C. § 35-41-3-2(i), (j). No remedy other than a mistrial could cure the error at that point and ensure Hickingbottom's right to a fair trial. That is because Hickingbottom's trial was almost completed at the time Williams's testimony made clear that written policies and procedures existed. Williams testified DOC officers are trained in accordance with DOC "policies and procedures," and the manual located on the DOC website consists of at least some of those written policies and procedures. *Tr. Vol. III* at 123; http://www.in.gov/idoc/2830.htm. Williams's testimony made clear that the policies and procedures which the State had been maintaining did not exist, in

fact, did exist. Thus, the State's failure to produce the manual was so prejudicial that Hickingbottom was placed in a position of grave peril to which he should not have been subjected. We, therefore, conclude that the trial court abused its discretion when it denied Hickingbottom's motion for mistrial. We reverse his conviction and remand for a new trial with instructions that, prior to any subsequent proceeding, the DOC shall produce the manual containing its policies and procedures pertaining to the use of force by DOC officers to the State so that Hickingbottom has the ability to review and utilize it.

[25] Reversed and remanded.

Riley, J., and Robb, J., concur.